# WILLIAM J. WOODROW v. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY.[1]

July 3, 1953.

No. 35,984.

[1]Reported in 60 N. W. (2d) 49.

*A. C. Erdall, S. W. Rider, Jr., J. R. Scoggin,* and *G. F. Bennett,* for appellant.

*William A. Tautges, Eugene A. Rerat,* and *Peterson & Brady,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

This action, based upon the federal employers' liability act (45 USCA, §§ 51 to 60) and the boiler inspection act (45 USCA, §§ 22 to 34), was brought by plaintiff, a locomotive engineer employed by defendant, to recover for personal injuries alleged to have been suffered by plaintiff during a run on defendant's railroad from Laredo, Missouri, to Ottumwa, Iowa. Plaintiff claimed that various defects in the engine or its appurtenances furnished by defendant proximately caused the injuries alleged. Defendant denied both liability and the extent of the injuries claimed. The action was

tried in district court before a jury, which returned a verdict of $86,560 for plaintiff. Thereafter, defendant moved for an order for judgment notwithstanding the verdict or for a new trial. The trial court, in its order of October 8, 1952, granted a new trial unless plaintiff, within 20 days from the date of the order, filed with the clerk of court his written consent that the verdict of the jury be reduced from $86,560 to $60,000. The order provided that in the event plaintiff consented to the reduction defendant's motion "will stand denied." On October 17, 1952, plaintiff and his attorneys consented in writing to a reduction of the verdict to $60,000, whereupon this appeal was taken.

Plaintiff claims that he was injured on November 12, 1949, while working for defendant as an engineer in operating engine No. 480 hauling about 70 cars from Laredo, Missouri, to Ottumwa, Iowa. The train left Laredo about 4:30 p. m. Having first stopped at Osgood, about 13 miles away, and Newton, about 26 miles away, it then stopped at Powersville, Missouri, some 39 miles from Laredo. The engine was not steaming as it should have been, and at Osgood the fireman cleaned the fire by opening the grates and knocking out the clinkers. It appears that, after this was done, he straightened the grates and shoved the coal on ahead, resulting in practically a new fire. This operation took about 45 minutes. The fireman took another 30 minutes to clean the fire at Newton, and the train arrived at Powersville about 7:45 that evening.

The train came into Powersville on the main line and then went over onto a passing track to permit a passenger extra to go by. The steam was down, and, since the fireman said that he was tired, plaintiff, who had been employed by defendant for 27 years, told the fireman to go down on the ground and clean the pans and that he would clean the fire for him. Plaintiff testified that he then started to clean the fire. In doing this he opened and closed the grates with a shaker bar by putting it down on the lugs. He said that he had finished cleaning three of the grates, had closed them, and was cleaning the last one on the fireman's side when the alleged accident occurred.

Plaintiff claims that the shaker bar was put on in the regular and usual manner and was down on the lugs as far as it could go; that there was some slack in the shaker bar where it normally fits tight; and that it was loose enough "so you could jiggle your shaker bar." He cleaned the clinkers out, shoved the live coal ahead onto the front section, and saw that everything had been removed from that section of the grate. He said that his next job was to close the grate; that he tried to pull the shaker bar to close the grate; that he had his hands on the top part of the shaker bar; and that he was facing toward the tender, his feet spread to brace himself on the deck of the engine and his back toward the boiler. He then took hold of the top of the shaker bar, got all the slack he could by pushing it in the forward motion, and pulled back toward the boiler with all his strength. As he was doing this the shaker bar came loose with a sudden, violent, unexpected motion, throwing him up against the boiler head. He said that it threw him a distance of about five feet; that the shaker bar came off the lug so that he had it in his hand; and that the lower part of his back hit against the boiler. He claimed that over a period of 32 or 33 years as a fireman and engineer he had operated thousands of shaker bars and had opened and closed grates on engines "tens of thousands of times." He mentioned that he was supposed to carry 200 pounds of steam on the engine; that it had been considerably lower than that on the trip; and that that was the reason they had to have the fire cleaned on the various occasions above referred to.

According to plaintiff, the accident occurred between 8:30 and 9:30 in the evening. After the accident the dispatcher instructed the train crew to leave the train at Powersville and go into Ottumwa with just the engine and caboose and they arrived at Ottumwa about one o'clock in the morning and on the roundhouse track about 1:20 a. m. He testified that after placing his engine in the west yard he reported to the roundhouse foreman, told him about his injury, and got an order to go to the company doctor. He reported to the foreman that the engine was not steaming but was leaking and that the shaker bar did not fit the grates properly.

He claims that he was in great pain during the trip and after he got home that night; that his wife put hot packs on his back and he had a restless night; and that he went to the company doctor, Dr. Nelson, in the forenoon of November 13. He said that the doctor gave him "some shots in the back"; taped his back; and told him to use some hot packs, to be careful, and that it would be all right for him "to go ahead and go to work." He resumed work until December 23, 1949, during which time he claims that he saw the doctor "every several days." He said that his back continued to be very sore and to give him trouble and that when he went to the doctor the latter would tape his back and give him some pills.

Plaintiff testified that on December 23 he went to work at Ottumwa and when he arrived at Laredo he was in such pain it was necessary for him to lay off and "deadhead" back to Ottumwa. On January 18, 1950, he was admitted to Wesley Memorial Hospital in Chicago, where he consulted with a Dr. Metz and other doctors and where he remained for approximately 30 days, during which time he received massage and pills and had a rectal operation. After returning from Chicago, he resumed work on February 28, 1950, got a body brace in April, and continued to work until August 28, 1950. He went to the Ottumwa Hospital about September 1, 1950, and was there for about a week, during which time he was in traction with a series of pulleys and weights attached to a rope. About the middle of September he again went to Wesley Memorial Hospital in Chicago and consulted with Dr. Metz. He remained until December 1950 receiving massage, medication, and sedatives. He returned to Ottumwa in December 1950 and claims that he remained under the care of Dr. Nelson until the time of trial.

Robert Boyd, Jr., the fireman on engine No. 480 on the day of the claimed accident, testified that he used the shaker bar in question on all four of the grate lugs on the engine that day, both before and after the time plaintiff claims that he was injured, but that he did not recall having any trouble with it. He said also that as far as he knew the shaker bar was in good condition.

Defendant assigns as error: (1) The denial of its motion for a directed verdict; (2) failure to give requested instructions Nos. 1 and 2; (3) permitting, over its objections, speculative and conjectural evidence that the grate-shaking apparatus was defective; (4) receiving certain evidence over its objections and striking certain evidence from the record; and (5) denying a new trial on the ground that the verdict as reduced is excessive and given under the influence of passion and prejudice.

■ Defendant claims that the court erred in denying its motion for a directed verdict. It claims that, when plaintiff consulted Dr. Raymond Householder in Chicago some two months after the accident, he said nothing about being forced against a boiler head or about a shaker bar coming loose when he was asked how the accident happened. In this regard, the doctor testified that according to his best recollection plaintiff did tell him that while at work on November 12, 1949, he sustained a sudden pain and soreness in his back while shaking some grates with a shaker bar on an engine.

Defendant further contends that plaintiff's version of how the accident happened was physically impossible. It argues that, if the grates were open as plaintiff claims, the shaker bar would be pointed toward the boiler, and it produced testimony to that effect. Defendant claims, therefore, that plaintiff could not have been thrown against the boiler in an attempt to close the grates. There was testimony on behalf of both sides that when the grates were closed the shaker bar would be in an almost perpendicular position while still in the lug. Defendant maintains that in order for plaintiff to be closing the grates from the position in which he claims he was at the time of the accident he would have to be pushing the bar toward the tender instead of pulling it toward the boiler. This argument, of course, is predicated upon the fact that the grates would not be open with the shaker bar in the position leaning toward the tender.

In addition to the testimony of plaintiff regarding the position of the shaker bar when he was attempting to pull it we have the testimony of his son, William E. Woodrow, Jr., who had been a

traveling fireman for the railroad company. While he admitted that in order to open the grates completely the shaker bar would have to be in a position which is in accordance with defendant's theory, he also testified that the grates could be opened as much as from one to three inches with the shaker bar in the position claimed by plaintiff.

We therefore have a conflict in the testimony which made this issue a fact question for the jury to determine. It must have concluded that plaintiff did have the shaker bar in the position he claimed and that his theory of the accident was consistent with the facts. On a motion for a directed verdict the evidence must be viewed in the light most favorable to the party opposing the motion. Merchants & Farmers Mut. Cas. Co. v. St. Paul-Mercury Ind. Co. 214 Minn. 544, 8 N. W. (2d) 827. A motion for a directed verdict by its very nature accepts the view of the entire evidence most favorable to the adverse party and admits the credibility, except in extreme cases, of the evidence in his favor and all reasonable inferences to be drawn therefrom. Hanrahan v. Safway Steel Scaffold Co. 233 Minn. 171, 46 N. W. (2d) 243.

In the light of all the testimony in connection with the manner in which the alleged accident occurred, we cannot say as a matter of law that the court erred in failing to direct a verdict under the facts and circumstances here.

■ Defendant contends that the trial court erred in failing to give its requested instruction to the effect that whatever testimony there was in the case regarding whether the engine or the boiler or the parts or appurtenances of either were leaking and whether the engine was steaming properly should be disregarded and not considered by the jury as a basis for liability, inasmuch as these defects, if any, were not the proximate cause of plaintiff's injuries. It maintains that the only claimed defect which could have had any bearing on the injury which plaintiff claimed to have received involved the shaker bar, grate lug, and grate rods. Defendant contends that in denying these requested instructions the trial court left the jury with the erroneous impression that any claimed de-

fects, no matter how remote as far as materiality or proximate cause was concerned, might form a basis for recovery.

While it is true that plaintiff introduced considerable testimony regarding various engine defects with reference to leaking boilers and other parts of the engine and also testimony with reference to improper steaming of the engine, an examination of the entire charge satisfies us that the court made it clear to the jury that plaintiff was claiming liability under the federal employers' liability act and the boiler inspection act primarily because of defective grate bars, grate lug, and grate rods. The court explained in its charge that it was the claim of plaintiff that he—

"* * * in the course of his employment, proceeded to shake the grates of the boiler of defendant's said engine, and while he, the plaintiff, was endeavoring to shake the grates of the boiler of defendant's engine, and was using the shaker bar owned and provided by the defendant for such purposes, in the usual and customary manner, said grates, shaker bar and appurtenances thereof were insufficient, defective, and unsafe and out of repair, and that they wouldn't function or operate in the usual manner, and that the shaker bar suddenly let loose, and the handle pulled off the shaker, and the plaintiff was caused to be thrown upon and against the boiler head and to be thereby severely and permanently injured. The plaintiff further claims that defendant failed and omitted to make timely and adequate inspection of its engines, tender, and appurtenances thereof, including the shaker bar, and that the defendant failed to give the plaintiff timely and adequate warning of the unsafe condition which he claims, of its engine and appurtenances, including the shaker bar, and that the defendant company failed and omitted to maintain for the plaintiff a reasonably safe place of work and reasonably safe appliances and appurtenances."

The court then went on to explain that plaintiff claimed that this constituted a violation of the federal employers' liability act; that as a result he was injured; and that such violation contributed to, in whole or in part, the injuries which he received.

538

Plaintiff explains that, while there was evidence to show that the flues were leaky and the fires clinkered, the only purpose of such evidence was to show the need for shaking the grates and using the shaker bar and that liability was expressly predicated upon the fact that the grates and appurtenances and the shaker bar were defective.

It is our opinion that the court's failure to give the requested instruction did not constitute reversible error. While the record shows evidence of leaky flues and defective steaming conditions of the engine, it appears that plaintiff did not contend that defendant was liable on those grounds but, rather, on the ground of the defective grates, shaker bar, and grate apparatus. The court may properly confine the charge so as to accord with the theory upon which a party predicates his case in the pleadings and upon the trial. Rosenberg v. Nelson, 145 Minn. 455, 177 N. W. 659.

■ Defendant claims that there was no competent evidence relating to any defects in the grate-shaking apparatus and that it was error to permit, over its objection, speculative and conjectural evidence that the grate-shaking apparatus was defective. A review of the entire record satisfies us that there was more than mere speculative and conjectural evidence with reference to these matters and that there is no reversible error in connection with the trial court's ruling in that respect. There was evidence to the effect that the grate rods were too low and too close to the ash pan; that when the rods became "red hot" they bent easier; that the rod on the grate which was shaken by plaintiff was bent and sprung; that the grates on this engine "were sticking, they was hard to break loose"; and that there was some slack in the particular shaker bar involved when put on the lug so that it jiggled where it normally should fit tight. It was within the discretion of the trial court to rule upon the admissibility of this evidence involving fact questions.

■ Defendant objects to plaintiff's exhibits Nos. 6 to 10, which consisted of various engine reports from defendant's files. Defendant contends that exhibit No. 6 was a report prepared by an employee

other than the one who testified and therefore was not admissible. It admits that the report was one of its records but contends that the manner of its introduction left defendant without an opportunity to cross-examine the person who prepared it as to any of the circumstances surrounding the entry in question. The court took the position that this was a business record and that, considered with the testimony connected therewith, it was evidence to be considered by the jury. It is our opinion, after a careful consideration of the entire testimony with reference to the exhibit, that, while it would have been preferable to have the employee who made the report testify, there was no dispute on the part of defendant that the exhibit was one of its records and that its admission under the circumstances did not constitute prejudicial error.

Exhibits Nos. 7 to 10 were more engine reports involving notations with reference to various defects in the engine under consideration. Among these notations was one on exhibit No. 7 "Raise up shaker rods they lay down on pan." Other notations on other exhibits pertain to "Water running out of pan," "Square valves eng very lame. Rods and boxes pounding bad," "Clean fire box and flues and examine for leaking eng steams very poor," and "Mud ring leaking right side." These reports range from 22 days before to some 15 days after the alleged accident of November 12. Defendant argues that the exhibits objected to were inadmissible inasmuch as the only claimed engine defects which could possibly have caused the accident related to shaker bars, rods, and grate apparatus. Plaintiff argues, in effect, that all this testimony shows the general conditions which gave rise to the use of the shaker bar and was therefore admissible.

In view of plaintiff's position that his claimed accident resulted from a defective shaker bar, grate lug, or grate rod, we agree with defendant that exhibits showing other defects in connection with the engine were not admissible unless they pertained to the defects claimed by plaintiff. While we believe that some of the exhibits showing unrelated defects in the engine, such as "Left front sand pipe loose in joint above wheel" and "Mud ring leaking right side,"

were inadmissible, we do not consider the admission of the exhibits, when viewed in the light of the entire record, constituted reversible error.

Defendant claims error in the admission of portions of the deposition of Carl A. Simpson, a retired employee, on the ground that any experience which the witness may have had with the engine in question would not tend to prove or disprove any issue in the case and was immaterial. The witness, according to his deposition, had been a fireman, engineer, and machinist for defendant for about 33 years. Over defendant's objection, he was permitted to testify as to various defects in the engine involved while he operated it on October 14, prior to the accident, and December 10 and 15, following the accident. The witness said that when he operated the engine on the above dates it was leaking every time; that the flues were leaking and the grates would lock; that the only way to move them was to knock the fire all out for that section of the grate, clean it, and then put it back; that his fireman had trouble with the grates; that it took both the witness and his fireman on occasions to operate one section of the grates; and that the grates would not lock if in working order. Defendant argues that the record shows that repairs are made on the engine at the end of runs and that tests are made and any needed repairs are taken care of as a matter of routine every month. It contends, therefore, that this evidence, in addition to touching on some immaterial engine conditions, was too remote. It is our opinion that the question of the remoteness of the testimony and its admissibility was within the discretion of the trial court and that any reference to defects in any part of the engine, except that pertaining to defective grate apparatus, was immaterial but not so prejudicial as to justify reversible error.

Defendant contends that the court erred in striking the testimony of its witnesses, Monty L. Kemp, Warren J. Young, and John Lippincott. Plaintiff admitted that on November 23, 1951, he had an accident on the Black Hawk bridge near his home in Ottumwa, Iowa. This was two years and 11 days after his alleged accident

on November 12, 1949. He testified that on the evening of November 23 he was on his way home; that the approach to the bridge was a rough one; and that the bridge was covered with ice. He claimed that he was driving only five or six miles an hour at the time; that he slowed down with the use of his brake; and that the car skidded and crashed into the railing on the right side only, bumped along a little, and practically came to a stop at about one mile an hour. He said that he opened the door and got out of the car and the car turned over and fell off the bridge. He estimated the distance of the fall at five or six feet in contrast with testimony of 12 to 15 feet. He claims that he received no injuries except a scratch on his forehead as he got out of the car and that he was sober at the time.

. The stricken testimony of Monty L. Kemp, a police officer for defendant railroad, was to the effect that he saw plaintiff come in the front door of the Milwaukee Cafe on the evening of November 23, 1951; that he did not know who he was at that time; that he was bareheaded and his clothes were very much misplaced or roughed up and soiled on one side; that he was very much "mussed up"; that he did not stop but went through a door; and that that was the last the witness saw of him. The witness then left the cafe and while en route to the railroad roundhouse came up to the Black Hawk bridge and the scene of the car accident. He described the condition of the car which he saw some 10 or 15 feet below the floor of the bridge. He claimed that about ten feet of the railing was taken out on the left side of the bridge and about 60 or 70 feet on the right side. Plaintiff moved that the testimony be stricken as immaterial, incompetent, and having no bearing on the issues of the case. The court at that point decided to let the testimony stand until he heard further testimony but indicated to counsel that unless the evidence went to prove an injury received by plaintiff at that time it would sustain objections to the evidence.

Warren J. Young, a police officer from Ottumwa whose testimony was later stricken, described going to the scene of the bridge accident after receiving a radio call between 8:00 and 8:30 on the

evening of November 23. He also described the condition of the bridge railing and the position of the car some 12 to 15 feet below the bridge floor. At the conclusion of his testimony plaintiff moved that it be stricken also on the ground that no proper foundation had been laid and that it was incompetent and immaterial, but this motion was denied for the time being.

John Lippincott, the other witness whose testimony was stricken, was a deputy sheriff of the county in which plaintiff lived. He testified that he went out to plaintiff's home the morning after the bridge accident to serve a paper upon him in connection with the accident; that he found him sitting on a davenport in the front room of his home; and that there was a small bandage of about one or two inches on his forehead. He said that he told plaintiff that he had a warrant for his arrest for leaving the scene of an accident and that he would have to go to town; that plaintiff said that he was not feeling well enough to go to town that morning; and that he told him to come in within a day or so when he was feeling better.

At the conclusion of this testimony plaintiff again moved that all the testimony of these three witnesses be stricken on the ground that it was incompetent, immaterial, no proper foundation laid and did not prove or disprove any issues in the case. Defendant resisted this motion, claiming that the testimony was important for two reasons: (1) That the witness had admitted that he had some injury and that he was not in shape to go to court; and (2) that it was a fact question for the jury as to plaintiff's story of the accident in view of the amount of railing taken out, the depth of the car fall, and plaintiff's condition as described by the witnesses. In ruling on the matter, the trial court said:

"There is no proof here that it was a major accident that I have seen in the testimony; * * * The reason I have permitted the testimony is to show whether, in fact, he was injured, there was any injury that amounted to testimony as an injury that affected the person of the plaintiff. I see no testimony here unless it is followed up by something additional upon which any fact could be

predicated as to injury received of any consequence, therefore the Court must grant the motion."

We are of the opinion that there was no error in the trial court's ruling in this matter. Had the evidence shown that plaintiff was injured in such alleged accident, it would clearly be admissible if it could be shown that such injuries further aggravated plaintiff's disabilities. However, there was no proof, nor any offer of proof, calculated to show that plaintiff sustained any injuries which might have aggravated his condition as it existed at the time of such bridge accident. In the absence of such proof or offer of proof, it was not error to strike the testimony of these witnesses.

■ Defendant argues that the verdict is excessive and was given under the influence of passion and prejudice. It contends that plaintiff's main complaint was that he had an injured intervertebral disc but that the three doctors who testified for defendant could find no such condition. In brief, it is defendant's position that plaintiff was not injured on November 12, 1949, as he claimed, but that whatever pain or soreness he has experienced is associated with an arthritic or degenerative back condition. On the other hand, it is plaintiff's claim in general that he was thrown against the engine boiler on the date in question with such a hard impact as to cause the injuries complained of, resulting in great pain and suffering and a 50-percent loss of earning power.

As usual in cases of this type, the medical testimony was in sharp conflict. One doctor testified on behalf of plaintiff and three for defendant, although it appears that seven doctors selected by defendant rendered various medical services to plaintiff from time to time.

Dr. Arthur F. Bratrud, who testified on behalf of plaintiff, first examined him on February 28, 1952. Dr. Bratrud graduated from the University of Minnesota Medical School in 1912. After further training and some service in the army as a doctor during World War I, he practiced in Minneapolis. While in the army he was connected with the Reconstruction Hospital. He testified that during the last six months of service in the army he was chief of the

Department of Peripheral Nerve Surgery and that since his return from service his practice has consisted mostly of surgery. For about 25 years prior to 1946 he was an assistant professor of surgery at the University of Minnesota Medical School on a part-time basis. He testified, with the aid of his notes and X rays which he had taken, regarding the pain and suffering experienced by plaintiff. He said that primarily plaintiff had a prolapsed or injured disc between the fourth and fifth vertebrae in the lower region of his back, an aggravated arthritic condition with a probable tearing of the ligaments around the lumbar sacral junction, and some apparent irritation of the nerves leading to both lower extremities. He explained about the pain which plaintiff claimed he suffered from the lumbar region down through both legs, about the various tests given plaintiff for motion and movement of his body, and other details of his examination. It was his opinion that plaintiff was permanently disabled for ever again doing the work of a railroad engineer. Plaintiff was about 50 years of age at the time of the alleged injury and about 52 at the time of the trial with a life expectancy of 19½ years.

Dr. Raymond Householder, testifying on behalf of defendant, said that he had charge of plaintiff while he was in Wesley Memorial Hospital in Chicago from January 18 to February 10, 1950, and again in the fall of that year. He said that in addition to complaints of feeling sick plaintiff generally complained of pain and soreness in the back and in both sacroiliac regions, indicating that the pain extended down the back of the thighs, into the region of the scrotum, and into the region about the rectum. When asked whether plaintiff had made any complaints about an injury to his back, the doctor answered "No." He testified that he found no vertebral or disc injury, that the back curve was normal, and that no back injury was found. When plaintiff returned to Wesley Memorial Hospital the latter part of September 1950, more X rays were taken; but no change was found between those films and the ones taken on January 18, 1950. According to Dr. Householder, plaintiff's complaints of pain were in the sacroiliac region and were

not located at the place where plaintiff now claims his injury. The witness testified that plaintiff said nothing to him about pain in the fourth or fifth lumbar vertebra and that he could not find anything on his X rays to indicate a vertebral or disc injury or any injury. It was Dr. Householder's opinion that plaintiff suffered no injury on November 12, 1949, and that his pain was due to degenerative changes. The record indicates that there was a loss of weight of plaintiff from around 185 or 190 pounds to about 160 pounds some time after the accident, but the doctor could not say that it was caused by an injury, since he said that he was unable to find any evidence of an injury.

Dr. Arthur H. Conley, another medical witness for defendant, examined plaintiff on March 29, 1951, and found that he complained of pain in the sacroiliac joint area but not in the lumbar spine area. He found no indication of traumatic injury in plaintiff's X ray exhibit nor evidence of a disc injury. It was his opinion that plaintiff was physically fit to return to work.

Dr. Otto W. Yoerg, the third witness for defendant, examined plaintiff on February 25, 1952. He had X rays taken, and according to his testimony plaintiff could return to work if he got some massage and manipulation of his back for a month or six weeks. He found an arthritic back condition when he examined plaintiff and claimed that such a condition would clear up within two or three months at the outside.

While several other doctors of defendant's choosing rendered some medical services to plaintiff at various times, the above-named doctors were the only ones who testified on behalf of defendant; but hospital records of the hospital at Ottumwa, Iowa, on Wesley Memorial Hospital in Chicago were produced.

It is our opinion, under the facts and circumstances, that the nature and extent of plaintiff's alleged injuries were fact questions for the jury to determine after hearing the conflicting evidence of the medical experts. We also believe that the trial court was in a better position to determine whether the jury's verdict of $86,560 was excessive than we are on appeal. The trial judge did determine

that the amount returned by the jury was excessive and reduced the verdict $26,560 and issued an order granting a new trial unless plaintiff, within 20 days of the date of the order, filed with the clerk his written consent to the reduced amount, which plaintiff did within the time limit. In a memorandum attached to its order the court said:

"I have come to the conclusion that the verdict should be reduced on the ground that it is excessive. It is my view that when all facts are taken into consideration as disclosed by plaintiff's claim in this case, having reference to loss of earnings, pain and suffering, past, present and future, life expectancy, and the other items, that the allowance in the way of damages was more liberal than the average award in such cases, and upon a similar set of facts. The present record, in my opinion, does not justify a greater recovery than the amount of the verdict as herein reduced."

A review of the entire record satisfies us that the amount of the reduction as set by the trial court should stand and that the order appealed from should be affirmed.

Affirmed.