ASTRID JENSEN v. JOYCE WERNER DIKEL AND OTHERS.[1]

February 25, 1955.

No. 36,359.

---

[1]Reported in 69 N. W. (2d) 108.

72

*Mordaunt & Mordaunt* and *Peter F. Walstad,* for appellant.

*Durham, Swanson & Lasley,* for respondents Joyce Werner Dikel, Werner Transportation Company, and Harry B. Werner.

*Freeman & Peterson* and *Thomas J. Burke,* for respondents Ralph R. Kriesel, Ralph R. Kriesel Company, and Downtown Chevrolet Company.

FRANK T. GALLAGHER, JUSTICE.

This case involves two appeals from judgments entered on verdicts at the same trial. One appeal is from a judgment entered in favor of defendants Joyce Werner Dikel, Harry B. Werner, and Werner Transportation Company. The other appeal is from a judgment

entered in favor of defendants Ralph R. Kriesel, also known as R. R. Kriesel, and Ralph R. Kriesel Company, a corporation, individually and doing business as Downtown Chevrolet Company. This group shall be referred to hereinafter as Downtown Chevrolet Company.

Plaintiff, Astrid Jensen, was employed by Joyce Werner Dikel as a nursemaid for her small son. On the evening of February 26, 1951, as Mrs. Dikel was taking her home, plaintiff was injured in a collision between a 1950 Cadillac driven by Mrs. Dikel and a 1937 Chevrolet driven by Arthur Kraft. The collision occurred at approximately 7:10 p. m. on that part of Lake of the Isles boulevard which runs generally east and west along the south side of Lake of the Isles in Minneapolis. Mrs. Dikel was driving in an easterly direction and Kraft was driving westerly. Lake of the Isles boulevard is a level, black-topped pavement 32 feet wide from curb to curb at the place of the collision. On that evening the surface of the roadway was wet, and there was some plowed snow alongside the curbs. The Chevrolet collided with the Cadillac at about a 45-degree angle so that the point of impact between the two cars was the center and left front of the Chevrolet and the left front of the Cadillac. After the collision, the Cadillac was two or three feet from the south curb in the eastbound lane while the Chevrolet was at least halfway across the center of the roadway into the lane occupied by the Cadillac.

According to the testimony of Arthur Kraft, he was unable to control his Chevrolet by the usual method of operating the steering wheel, and, as a result, his car veered into the Cadillac. Two policemen who were sent to the scene of the collision testified that they were unable to turn the front wheels of the Chevrolet by turning the steering wheel. Experts who subsequently examined the Chevrolet testified that an essential connection in the steering apparatus—the drag link and Pitman arm assembly—had separated. They disagreed, however, as to whether the separation of the two parts occurred prior to, and caused, the collision or resulted from the impact of the collision.

Kraft had purchased the 1937 Chevrolet from Downtown Chevrolet Company on February 19, 1951, a week before the collision, and had driven it about 125 miles. Mrs. Dikel was driving the Cadillac with the permission of its owner, Werner Transportation Company, of which her father, Harry B. Werner, is president. When the collision occurred, plaintiff was seated in the right front seat of the Cadillac, with Mrs. Dikel's small son seated in the middle of the front seat between the two women. Samuel Dikel, husband of the driver, was seated in the right rear seat. Plaintiff received injuries to her back and knees.

At the trial plaintiff introduced the drag link and Pitman arm assembly taken from Kraft's Chevrolet and also a new drag link and Pitman arm assembly now used for replacement in a car of that model. Downtown Chevrolet Company introduced a drag link and Pitman arm assembly taken from a used 1937 Chevrolet of the same model as the Kraft Chevrolet. At the close of all the evidence, the court directed a verdict in favor of Mrs. Dikel, Harry B. Werner, and Werner Transportation Company on the ground that there was no evidence of any negligence on the part of Mrs. Dikel in driving the Cadillac which proximately caused or contributed to the collision, and judgment was entered accordingly. Plaintiff then dismissed her action against Arthur Kraft. Although it does not appear of record, the jury requested and took with it into the jury room a screw driver and pliers. A jury verdict was returned for Downtown Chevrolet Company, and judgment was entered.

■ In plaintiff's appeal from the judgment entered in favor of Joyce Werner Dikel, Harry B. Werner, and Werner Transportation Company, she contends that the facts of the collision present a question for the jury as to whether Mrs. Dikel could have prevented or avoided the collision. The sole issue on that appeal, therefore, is whether Mrs. Dikel's alleged negligence was an issue for the determination of the jury or whether the trial court properly directed a verdict in favor of Mrs. Dikel.

While we deem it unnecessary to review all of the conflicting testimony as to when the drivers of the colliding cars first saw each other, when or where they stopped, their speed, et cetera, we shall

discuss some of the conflicts in the testimony of Arthur Kraft and Mrs. Dikel. We must necessarily rely on the testimony of those two witnesses in respect to some of these matters, as plaintiff admits that she was directing her attention just prior to the accident to the little Dikel boy seated beside her and did not pay any attention to either of the cars, did not observe the Kraft car as it approached, and did not even know on which side of the road Mrs. Dikel was driving just before the accident. Samuel Dikel was seated in the back seat of the Cadillac and first saw the headlights of the Kraft car when it was over 300 feet away. He apparently paid no particular attention to the lights again until his wife exclaimed "What is that fellow trying to do" when the Kraft car was about 50 feet away and coming directly toward them.

With reference to conflicts in Kraft's own testimony, when called for cross-examination under the statute, he testified that he first saw the Cadillac at a distance of three blocks, at which time he was traveling at a speed of 20 to 25 miles an hour. He then estimated the speed of the approaching Cadillac at 25 to 30 miles per hour and said that both cars were in their proper lanes. He then went on to testify that, when he lost control of his car, it started to go off to the left and that the Cadillac was then one block away. He thought that he was on an icy spot and said that he attempted to control his Chevrolet by applying a little pressure on the brake at a time. He said that the car driven by Mrs. Dikel was trying to move over to its right side as far as possible. He claimed that at the time of the impact neither car had stopped. However, some of this testimony was in conflict with prior testimony of Kraft which he admitted at the trial was given in a deposition taken before the trial. At that time he said that when his car first went out of control he was two car lengths away from the Cadillac and that the latter car "was about three car lengths away or more when I started swerving." He further said in his deposition that his Chevrolet was in the center of the south or eastbound lane at the time of impact.

Similar conflicts appear in Mrs. Dikel's testimony. On cross-examination under the statute she testified that she was driving

east; that Kraft was driving west on the boulevard on the south side of Lake of the Isles; that both cars had on their headlights; and that each car was in its proper lane. She further said that when she first observed the Kraft car she was a little west of the tool shed, which was about 50 feet west of the point of collision, and that the Chevrolet was then coming right at her. She claimed on cross-examination that the Chevrolet started coming to her side of the road when it was about four to six car lengths away and that at that time she was traveling 25 miles an hour. She testified that she applied her brakes but did not jam them on because the road was wet; that she slowed the car to a gradual stop and turned to her right as far as possible but could not say how close to the outside she went because it all happened so quickly; and that the collision was head on. She admitted at the trial that she made a statement in her deposition taken prior to the trial to the effect that, when she first saw the Chevrolet, it was turning the corner coming from East Lake of the Isles boulevard and that "he was coming diagonally at us from his side of the road straight across to ours." Patrolman James T. Curran testified that the distance from the point where Mrs. Dikel said in her deposition she first saw the Chevrolet coming around the corner was about 500 feet from the scene of the accident. If Mrs. Dikel was correct in her deposition that she first saw the Chevrolet turning the corner coming from East Lake of the Isles boulevard, there is testimony in the record that this was about 500 feet from the scene of the accident. We therefore have a fact question as to whether she first observed the car coming toward her when it was four to six car lengths away or when it was some 500 feet away. She also said that, when she first saw the Kraft car coming toward her, she applied her brakes but not hard. There was testimony from the patrolman who visited the scene of the accident shortly afterward that, although cars had passed after the accident, he observed no skid marks for either car.

It seems to us that, under our rules, there was sufficient conflict in the evidence here so that the issue whether Mrs. Dikel did all that was necessary to prevent the accident under the circumstances here should have gone to the jury. It must be remembered that

plaintiff was not driving either of the colliding cars but was a passenger in the Dikel car and that she was not charged with the negligence of either driver, if any existed. It is our opinion that, if the Chevrolet suddenly swerved into the path of Mrs. Dikel's car when it was only four to six car lengths away, she did all that could have been done to avoid the accident under the circumstances. If she first observed this car as it was turning the corner coming to East Lake of the Isles boulevard some 500 feet away and it was coming diagonally toward her, it would have been a fact question for the jury to determine whether, under those circumstances, she did all that was possible to avoid the accident. It is therefore our opinion that the motion for a directed verdict should not have been granted.

A motion for a directed verdict[2] by its very nature accepts the view of the evidence most favorable to the party against whom the verdict is to be directed and admits the credibility, except in extreme cases, of the evidence in his favor and all reasonable inferences to be drawn therefrom. Woodrow v. Chicago, M. St. P. & P. R. Co. 239 Minn. 530, 60 N. W. (2d) 49. It presents only a question of law. Hanrahan v. Safway Steel Scaffold Co. 233 Minn. 171, 46 N. W. (2d) 243. A question of negligence, as here, generally is for the jury, and only where all reasonable men must and would draw the same conclusion from the facts is the question of negligence considered a question of law for the court. Mayzlik v. Lansing Elev. Co. 241 Minn. 468, 63 N. W. (2d) 380. Thus, in Kundiger v. Prudential Ins. Co. 219 Minn. 25, 27, 17 N. W. (2d) 49, 51, we said that a motion for a directed verdict should not be granted—

"unless there is complete absence of evidence reasonably sustaining plaintiff's claim, or unless the evidence in support of his claim is wholly incredible and unworthy of belief or so conclusively overcome by other uncontradicted evidence as to leave nothing upon which a verdict can stand. [Citing cases.] 'If the record discloses evidence, taking the most favorable view of it for the plaintiff, sufficient to sustain a verdict for him, the motion [for a directed verdict]

[2]See Rule 50.01 of Rules of Civil Procedure, especially the last sentence thereof, for the procedure under the new rules.

should not be granted.' Osborn v. Will, 183 Minn. 205, 208, 236 N. W. 197, 199."

In connection with her appeal from the judgment in favor of Downtown Chevrolet Company, plaintiff contends that the verdict of the jury is not justified by the evidence and that the jury was guilty of misconduct in procuring tools and making experiments in the jury room. We deem it necessary to consider only the latter ground for determination of that appeal.

There are affidavits from three jurors, from counsel for plaintiff and for Downtown Chevrolet Company, and from two bailiffs, as well as a memorandum by the trial court, all of which concern the following incidents which do not appear of record: Before the jury retired for deliberations, one juror, a Mr. Olson, requested a screw driver and pliers. Plaintiff's counsel then approached the bench and conferred with the court. At that time, according to the memorandum of the trial court and the affidavits of the two bailiffs and of counsel for Downtown Chevrolet Company, plaintiff's counsel consented to, or failed to object to, the allowance of the jury to take a screw driver and pliers with them. Plaintiff's counsel in his affidavit denies that he gave consent to the use of the tools by the jury. He contends that he objected to the use of the tools by the jury and that he did not know that the jury had taken the tools until after the verdict was returned. In any event, the jury was supplied with a screw driver and pliers by the bailiff in charge of the jury. In their affidavits, the two jurors state that juror Olson used the screw driver and pliers in the jury room to perform an independent experiment on the Pitman arm and drag link assembly from Kraft's Chevrolet, substituting a part from the Pitman arm and drag link assembly introduced by Downtown Chevrolet Company for a missing part in the Kraft Chevrolet Pitman arm and drag link assembly. The experiment allegedly proved that it was impossible for the drag link and Pitman arm assembly to separate, as claimed by plaintiff.

As we view the situation under the circumstances here, the question for our consideration is what properly may be sent with the

jury for use in its deliberations in the jury room. In considering that matter, we do not intend to depart from our former decisions regarding the admissibility of affidavits of jurors and others in such matters, but, because of the unusual situation before us, we feel that it deserves special consideration. Here we have affidavits from jurors, from counsel, and from bailiffs and a court memorandum, all pertaining to incidents which well might have been of real importance in the decision of this case, but there is nothing in the record pertaining to those incidents. We are cognizant of the general rule that a juror may not impeach a verdict which he took part in rendering, although there may be exceptional cases where a verdict may be impeached by affidavits showing objective circumstances and overt acts amounting to undue coercion. Affidavits of jurors as to what transpired in the jury room, or as to misconduct of the officer having them in charge, are inadmissible to impeach their verdict. 14 Dunnell, Dig. (3 ed.) § 7109.

M. S. A. 546.15 provides that the jury may take with them during deliberations all papers in evidence except depositions, subject to the court's discretion to submit copies of documents or records for the original papers. Under that statute, the jury may also take with them any notes of the testimony and proceedings made by themselves. The jury also may take to the jury room all exhibits introduced in evidence at the trial. Mason's Dunnell, Minn. Pract. § 1463, and cases cited under note 4. Under this rule the trial court, at the suggestion of or on motion of counsel or in its own discretion, may for good cause withhold or restrict by proper instructions the use of exhibits by the jury. See, State v. Olson, 95 Minn. 104, 103 N. W. 727; Higgins v. Los Angeles Gas & Elec. Co. 159 Cal. 651, 115 P. 313, 34 L.R.A.(N.S.) 717; Chitwood v. Philadelphia & Reading Ry. Co. 266 Pa. 435, 109 A. 645; People v. Holcomb, 370 Ill. 299, 18 N. E. (2d) 878. Thus the trial court has a wide discretion in the use of exhibits by the jury. The better practice would be to introduce in evidence, for whatever purpose allowed by the trial court, any objects such as models, tools, equipment used by experts for illustration, explanation, or experiments, or other objects which counsel may want to have sent with the jury during deliberations.

It would then be the duty of counsel to take the necessary steps to insure the proper use or restriction on the use of such exhibits.

When objects have been used by witnesses at the trial but have not been introduced in evidence, the fact that those objects either are sent with or are withheld from the jury cannot be assigned as error unless it appears from the record that counsel made a timely and proper objection thereto or that it was a clear abuse of discretion for the court to have allowed or denied the object to the jury, as the case may be. See, Ashton v. Higgins, 80 R. I. 350, 96 A. (2d) 632; Campbell v. Ashler, 320 Mass. 475, 70 N. E. (2d) 302. But where, as here, the jury, with the approval of the court, is given tools or other objects which were not even present at the trial or which were not used to aid the jury in its understanding of testimony, it is our opinion that the supervisory duties of the court require it to safeguard the rights of all parties by obtaining their consent to such action. Further, the court must preclude any question as to the consent given by making it a part of the record. In this way the court also will remove any question as to its own actions in the matter. We previously have held under different circumstances that the court must protect its actions and the rights of parties by making such actions a part of the record. See, State v. Clow, 215 Minn. 380, 10 N. W. (2d) 359.

In the absence of a positive showing of consent in the record, we have a situation here where men of unquestioned integrity differ in their affidavits as to the content and purport of a discussion not on record. The trial court has the duty to supervise and control the trials conducted before it. See, generally, Mason's Dunnell, Minn. Pract. § 1424. The trial judge, therefore, is in the best position to prevent such disputes as the one at bar by insuring that the consent of all parties appears as a matter of record. And because the record here is silent as to the consent of the parties, we cannot assume that this plaintiff consented to the use of the screw driver and pliers by the jury. We conclude that the trial court's action objected to by plaintiff was prejudicial to her and necessitates a new trial.

Both judgments reversed, and a new trial granted.