BERRY, Respondent v. BENNER, et al., Appellants

(139 N.W.2d 285)

(File Nos. 10161 - 10162.  Opinion filed January 7, 1966)

**Bangs, McCullen, Butler & Foye,** Rapid City, for defendants and appellants.

**Whiting, Lynn, Freiberg & Shultz,** Rapid City, and **Hayes & Richards,** Deadwood, for plaintiff and respondent.

ROBERTS, J. Northwest Wood Preserving Company was engaged in the processing and sale of wood products, principally posts, in the City of Deadwood, South Dakota. On March 8, 1961, when a written contract for the sale of all the authorized and outstanding stock was entered into, Geraldine W. Berry, her three sons and A. W. Thornton were owners of all the outstanding stock. Prior to the commencement of the present action, the other stockholders assigned their rights to plaintiff.

W. Del Clinton, a resident of Minneapolis, Minnesota, was engaged as a consultant in May, 1959, to design and oversee a system of records and accounts and to make recommendations in the field of management. The original records were kept at the plant under the supervision of Warner Berry who allocated expenditures to the various accounts and transmitted to Clinton copies of each check with the account allocation shown thereon.

On September 8, 1959, the plant at Deadwood was destroyed by fire. Clinton was consulted along with an engineer regarding a new plant to be located at Whitewood, South Dakota. The company had obtained a Small Business Administration loan of $110,000 in December, 1957. Another loan from that agency in the sum of $257,000 was with the assistance of Clinton negotiated for the purpose of constructing the new plant. Construction of the plant at Whitewood was commenced in December, 1959, and salvaged and repaired equipment and machinery were utilized or installed at the new and enlarged plant. The plant became operational on April 1, 1960, but was not then complete and construction continued throughout 1960. The proper allocation of payroll and other expenditures as between operational expenses and capital costs of the new plant is here involved.

On January 20, 1961, the stockholders of Northwest Wood Preserving Company received an offer from Donald G. Benner,

Minneapolis, Minnesota, to buy all the common capital stock of the company at the "net worth of the corporation as of January 31, 1961, plus the sum of $120,000." It contained the terms and condition that net worth be based on the balance sheet of the company as it appeared in its financial report of December 31, 1959, then determined as of January 31, 1961, in accordance with the practices permissible under the provisions of the Internal Revenue Code. There was to be deducted the amount owing on account of an outstanding liquidation agreement and the book value of land and buildings in Deadwood. The stockholders submitted a qualified offer of acceptance. The original offer was never accepted as submitted.

The parties thereafter entered into negotiations and worked out the terms and conditions of an agreement as evidenced by their contract of March 8, 1961. The contract contains these terms of purchase and sale:

"The Sellers shall sell and the Purchaser shall purchase the entire capital stock of the Company for the sum of $120,000.00 subject to the adjustments of the purchase price hereinafter set forth.

"A. Reductions: There shall be deducted from the purchase price referred to in the foregoing paragraph the sum of $26,013.06 which represents:

1. The sum of $16,452.00 representing a liability by reason of an outstanding stock liquidation agreement made and entered into July 18, 1951 by and between the said Company and a number of its stockholders.

2. The sum of $9,561.06 representing the book value on January 31, 1961 of certain lands and buildings located in Deadwood, South Dakota, depreciated, which are not included in the assets of the corporation subject to this agreement.

"B. Purchase Price: The purchase price as hereinbefore determined shall be the sum of $93,986.94 or such adjusted purchase price as shall result from the

determination of the arbitration hereinbefore referred to in Paragraph I C above.  *  *  *

"The Sellers warrant and represent that if there are any legally enforceable claims against the Company which arise after the closing of this transaction which are not disclosed in the statement of financial condition prepared by W. Del Clinton hereinbefore referred to and there is liability on the part of the Company by reason thereof, said amounts shall be deducted from the balance of the purchase price hereinbefore described *  *  * "

Paragraph I C referred to provides:

"That the Company is the owner of certain assets which are subject to certain encumbrances, all of which are described in the statement of financial condition of W. Del Clinton heretofore made and delivered to each of the parties hereto, the receipt of which statement of financial condition is acknowledged by each of the parties hereto; and that said statement of financial condition as of January 31, 1961 represents, according to the Company's books and records, a statement of the affairs of the Company. Said statement of financial condition as the same has been prepared by W. Del Clinton indicates that the Company has no net worth and has, in fact, a negative net worth in an amount so stated in said report of financial condition. The Sellers desire that said statement of financial condition be examined by an accountant of their own choosing, and to that end, have selected one, Donald Dunmire, a certified public accountant of Rapid City, South Dakota to make an examination into said statement of financial condition. Such examination by said Donald Dunmire shall be at the sole expense of the Sellers.

"If upon such examination, the said Donald Dunmire shall agree substantially with the statement of financial condition as the same has been determined by said W. Del Clinton, there shall be no further need for any ex-

amination into the financial affairs of the Company. If there shall be substantial disagreement between the report and examination of said Donald Dunmire and the report of said W. Del Clinton, then and in that event, the dispute, if any, which exists shall be referred to Richard Heldridge, executive vice-president of the First National Bank of the Black Hills, Rapid City, South Dakota to act as arbiter; and both the Sellers and the Buyer agree to be bound by the findings of said Richard Heldridge as they relate to a determination of the existence or non-existence of net worth of the Company as of January 31, 1961. The expense resulting from a submission of this matter to arbitration to the said Richard Heldridge as arbiter, if this shall become necessary, shall be borne equally by the Sellers and the Purchaser."

The Clinton report of January 31, 1961, indicates a negative net worth of $40,869.00. The parties had conducted their initial negotiations upon the basis of a report as of the close of business of October 31, 1960, disclosing a net worth of $85,924.00. Donald Dunmire engaged to make an examination of the Clinton report as in the contract provided submitted his report which was received in evidence. This report showed an increase of $87,644.88 in net worth. The conclusions in the reports resulted mostly from capitalizing items in construction of the new plant instead of allocation to expenses. From such increased amount was deducted the net worth of minus $40,869 in the Clinton report which resulted in a reported net worth of $46,775.88.

Richard Heldridge whom the parties named to act as arbiter in the event of a "substantial disagreement" between the examination and report of Donald Dunmire and the report of W. Del Clinton, declined to act.

The present action was commenced on October 29, 1962, seeking a determination of the amount due under the contract to purchase the capital stock of the company. The sale agreement contemplated that the "statement of financial" conditions as prepared by Clinton be examined by Dunmire and that "any

substantial disagreement" be submitted to arbitration. The parties seemingly agree that upon refusal of the arbiter named to act authority of the trial court to make a determination of the net worth stemmed from their agreement.

The trial court found:

"The Court further finds that during the period of construction that at least 75% of all activity was in construction."

"Attached hereto are schedules of computation which the Court finds should be incorporated herein in arriving at net worth. The Court necessarily in finding a net worth uses figures at hand, the evidence produced, plus all financial and operating reports and prior financial condition to arrive at a fair and just net worth."

"The Court further finds that, if the item of $16,452.00 is to be deducted from the $120,000.00 figure, it should not have been deducted by the financial advisor (Clinton) from net worth."

"That starting from the negative net worth figure of $40,869.00 and adding thereto this Court's findings of additions to net worth of $42,479.59 this makes a positive net worth of $1,610.59 as of January 31, 1961. From this amount must be deducted the sum of $9,049.16, items not disclosed in the financial report, leaving a net worth of —$7,438.57 which under the terms of the contract must be deducted from the purchase price as being in excess of disclosed liabilities."

The court concluded that the adjusted price under the contract is the sum of $102,998.65. This results from subtraction of the contracted value of the Deadwood property and the excess of undisclosed liabilities over net worth from the basic price of $120,000.

Defendant contends that the deduction of $26,013.06 is definitely determined and required by the very terms of the contract. Within that amount is $9,561.06 which is the agreed value of the Deadwood property and about which there is no contro-

versy. The additional amount of $16,452 represents a liability arising out of a stock liquidation agreement. The contract also provides for a deduction of undisclosed claims against the company and appellant contends that he is also entitled to deduction of such claims in the amount of $10,457.07. After deducting these amounts from the basic price appellant arrives at an adjusted purchase price of $83,529.87.

Northwest Wood Preserving Company entered into a contract dated July 18, 1951, with former stockholders to purchase their shares of stock in the company. A balance of $16,452 together with accrued interest was unpaid. It was admitted by Mr. Clinton that the balance sheet of October 31, 1960, upon which the parties relied in their negotiations did not include this item. We agree with the trial court that it was not intended that the item be twice deducted.

Defendants contend that if full effect is to be given to the provisions of the written contract for deduction of claims not disclosed in the Clinton report they are entitled to a deduction of $10,457.07. The court allowed a deduction of $9,049.16. Donald Dunmire was appointed by the court to make examination of the books and accounts of the company and report items of undisclosed liabilities. It appears from a schedule attached to the findings of the court that the deductions included items reported by Dunmire as being undisclosed liabilities with the exception of the item "Owed Joe Werlinger for freight" which was reported in the amount of $4,436.26, but was allowed by the court in the amount of $3,028.25, the amount of the checks shown by the exhibits as paid. The majority of the court believes it was for the trial court to determine this item of undisclosed liability and the court did not err in so finding. The evidence in the opinion of the minority is without substantial conflict as to this item and should have been allowed in the larger amount.

Defendants contend that net worth should have been based on the balance sheet of Northwest Wood Preserving Company as of December 31, 1959, a condition of his original offer. This offer as we have explained was never accepted as submitted. The transaction as it was actually consummated is evi-

denced by the written contract. We have considered the other claims of error, but do not deem it necessary to discuss them.

Plaintiff on cross appeal contends that there can be no determination of net worth until the fair value of the company's assets has been determined and that in the absence of a specified method by which to ascertain such value the court should have heard the testimony of witnesses qualified to appraise assets of the character owned by the company. A case on appeal will be considered only upon the theory upon which it was tried below. Kindley v. Williams, 76 S.D. 225, 76 N.W.2d 227, 57 A.L.R.2d 1070. The agreement for sale of the stock was that the statement of financial condition as prepared by W. Del Clinton be examined by Donald Dunmire and that any substantial disagreement be submitted to arbitration. The agreement did not provide for the determination of net worth by appraisal of assets. The negotiations between the parties as stated culminated in the written agreement expressing the whole contract. In the absence of fraud, mistake or ambiguity the intention of the parties must be gathered from this agreement subsequently entered into. Vaughn v. Rosencrance, 73 S.D. 36, 38 N.W.2d 822.

Judgment is affirmed. Inasmuch as neither plaintiff nor defendants on their respective appeals have prevailed, no costs will be taxed.

All the Judges concur.