Mark A. WHEELDON and Sandra L. Wheeldon, and Mark A. Wheeldon as Special Administrator of the Estate of Heather Briann Wheeldon, Deceased, Plaintiffs and Appellants,

v.

Dean L. MADISON, and Obstetrics & Gynecology, Ltd., a South Dakota Corporation, Defendants and Appellees.

Nos. 14387, 14444.

Supreme Court of South Dakota.

Argued Oct. 24, 1984.

Decided Sept. 6, 1985.

Robert J. Burns, Sioux Falls, for plaintiffs and appellants.

Carleton R. Hoy and Edwin E. Evans of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendants and appellees.

WOLLMAN, Justice.

This is a consolidation of two appeals involving a medical malpractice action. Plaintiffs, Mark A. Wheeldon, as special administrator of the estate of his stillborn child, Heather Briann Wheeldon, deceased, and Sandra L. Wheeldon, mother of the child, alleged, inter alia, that defendant Dr. Dean L. Madison had negligently performed certain prenatal procedures, wrongfully causing the death of Heather Briann Wheeldon, who was at the time of her death a viable but unborn child. In addition to the wrongful death claim, plaintiffs sought damages on their own behalf from Dr. Madison and the professional corporation of which he was a member at the time of this action, Obstetrics and Gynecology, Ltd.

In # 14387, plaintiffs appeal from the pre-trial order dismissing the wrongful death count of the complaint. In # 14444, plaintiffs appeal from the judgment entered following a jury verdict in favor of defendants in plaintiffs' suit for damages on their own behalf. We affirm the judgment in # 14444. We dismiss as moot the appeal in # 14387.

On appeal from the verdict in # 14444, plaintiffs contend that the trial court erred: (1) by not completely and adequately instructing the jury on the issue of informed consent and in refusing to instruct the jury on the issue of alternative treatment; (2) by admitting testimony from a physician who was treating Mrs. Wheeldon at the time of trial; and (3) by not allowing a certain trial exhibit to be taken into the jury room during jury deliberations.

In late 1981, Mrs. Wheeldon became pregnant with her second child. In August

of 1982, Mrs. Wheeldon's family physician, Dr. Gregory Magnuson, believing that Mrs. Wheeldon should undergo a repeat caesarean section for delivery of the baby, referred her to Dr. Dean L. Madison (Dr. Madison), a board-certified obstetrician and gynecologist. Dr. Madison had delivered Mrs. Wheeldon's first child by caesarean section.

On August 27, 1982, a nurse from Dr. Madison's office called Mrs. Wheeldon to schedule her for an amniocentesis procedure. Amniocentesis is the tapping of the amnion (inner layer of tissue which forms the bag containing the fetus in the uterus) with a needle inserted through the abdominal wall. This procedure is used to obtain a sample of the amniotic fluid for laboratory testing. Mrs. Wheeldon told the nurse that she did not want to undergo the procedure. She had learned from reading general magazine articles and through discussions with several people that there were some risks associated with the procedure. Specifically, she was concerned about the possibility of a miscarriage or the hitting of the fetus with the needle. The nurse stated that it was Dr. Madison's practice for all repeat caesarean section patients to have an amniocentesis. Following Mrs. Wheeldon's conversation with the nurse, Dr. Madison telephoned her. He explained to her that the purpose of the amniocentesis was to determine fetal lung maturity and to guard against the possibility of respiratory distress in the newborn infant. Dr. Madison further stated that the risk of delivering a prematurely born child with respiratory distress far outweighed the risk of undergoing the amniocentesis. Mrs. Wheeldon then inquired whether she could forego the amniocentesis and just wait to go into labor. Dr. Madison explained that the risk of possible anesthesia complications dictated against this approach.

Mrs. Wheeldon agreed to undergo the procedure, and an appointment was scheduled for September 1, 1982. The amniocentesis procedure performed on that date occurred without incident. The results from this test were inconclusive, however, and a second amniocentesis was scheduled for the following week. Mrs. Wheeldon returned to Dr. Madison's office on September 8, 1982, for the repeat amniocentesis. During this second amniocentesis, blood appeared in the amniotic fluid. There was also a simultaneous movement of the fetus during the course of the procedure. This test result, where blood is expressed along with amniotic fluid, is known in medical literature as a "bloody tap." Dr. Madison then terminated the procedure, believing he had withdrawn a sufficient amount of amniotic fluid to conduct a test. The ultrasound technician assisting Dr. Madison in the procedure scanned Mrs. Wheeldon's abdomen for the purpose of observing fetal movement and cardiac activity. He concluded that everything appeared normal. Mrs. Wheeldon returned home.

Later that same day, after arising from a nap, Mrs. Wheeldon determined that she could not feel any fetal activity. This condition persisted throughout the evening of September 8. Mrs. Wheeldon was admitted to Sioux Valley Hospital later that same night. Drs. Madison and Magnuson then performed a caesarean section delivery of Mrs. Wheeldon's stillborn fetus. The cause of death was determined to be fetal exsanguination, i.e., death due to extensive loss of blood by the fetus. Dr. Madison conducted an examination of the fetus and concluded that a small fetal vessel on the surface of the placenta had probably been lacerated by the needle used to perform the amniocentesis, resulting in fetal exsanguination.

Plaintiffs' contention during trial was that Dr. Madison's conduct in managing the "bloody tap" fell below the professionally acceptable standard of care. Plaintiffs and defendants presented expert testimony on this issue, with the jury resolving the question in favor of Dr. Madison.

Plaintiffs also contended at trial that Dr. Madison was negligent in failing to inform Mrs. Wheeldon of the risks to the unborn child associated with the amniocentesis procedure and in failing to discuss with her

alternative forms of treatment. The trial court instructed the jury on the issue of informed consent. The trial court concluded, however, that the evidence presented did not warrant an instruction on the issue of alternative treatment.

### Adequacy of Jury Instruction

Defendants objected to the trial court's instruction on informed consent, contending that plaintiffs had failed to present expert testimony establishing the existence or the extent of defendants' duty to disclose the risks of the amniocentesis procedure. In rejecting defendants' motion for directed verdict on plaintiffs' informed consent claim, the trial court, while acknowledging that the question has not yet been expressly decided by this court, ruled that expert testimony is not necessary on the question of informed consent. Rather, the trial court concluded, the issue could be resolved by the jury's employing an objective, reasonably prudent person test notwithstanding the absence of expert testimony.

The trial court's instruction on the issue of informed consent to the jury read as follows:

16.

It is the duty of a physician to obtain the consent of a patient before treating or operating on him. Such consent may be express or may be implied from the circumstances.

In this regard, it is the duty of the physician or surgeon to disclose to his patient all material information to enable the patient to make informed decision regarding the proposed operation or treatment.

Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure. To be material a fact must also be one which is not commonly appreciated.

There is no duty to discuss minor risks inherent in common procedures, when such procedures very seldom result in serious ill effects.

However, when a procedure inherently involves a known risk of death or serious bodily harm it is the physician's or surgeon's duty to disclose to his patient the possibility of such outcome and to explain in lay terms the complications that might possibly occur.

Even though the patient has consented to a proposed treatment or operation, the failure of the physician or surgeon to inform the patient as stated in this instruction before obtaining such consent is negligence and renders the physician or surgeon subject to liability for any injury proximately resulting from the treatment if a reasonably prudent person in the patient's position would not have consented to the treatment if he had been adequately informed of all the significant perils.

Plaintiffs contend that this instruction does not adequately reflect the current law in this state on informed consent. They proposed an instruction as follows:

A doctor has the duty to make a reasonable disclosure to his patient of the significant risks in view of the gravity of the patient's condition, the probabilities of success, and any alternative treatment or procedures, if such are reasonably appropriate, so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure.

This proposed instruction was based upon our decision in *Cunningham v. Yankton Clinic, P.A.*, where we held in part:

A doctor has the duty to make a reasonable disclosure to his patient of the significant risks in view of the gravity of the patient's condition, the probabilities of success, and any alternative treatment or procedures, if such are reasonably appropriate, so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure.

262 N.W.2d 508, 511 (S.D.1978). *See also Alberts v. Giebink,* 299 N.W.2d 454 (S.D. 1980).

Specifically, plaintiffs argue that Instruction 16 is deficient because it does not sufficiently explain the requirement of disclosure of significant risks and alternative treatment or procedures.

 In testing the sufficiency of a trial court's instructions, we have held that "jury instructions must be considered as a whole in determining if error was committed in giving or refusing to give certain instructions." *Degen v. Bayman,* 90 S.D. 400, 241 N.W.2d 703, 706 (1976). When considered as a whole, jury instructions are adequate when they correctly state the law applicable to the case. *Arcon Const. Co. v. South Dakota Cement Plant,* 349 N.W.2d 407 (S.D.1984); *Black v. Gardner,* 320 N.W.2d 153 (S.D.1982). Nor is it error for the trial court to refuse to expand upon instructions given to the jury when those instructions substantially cover the principles embodied in the requested instruction. *Jahnig v. Coisman,* 283 N.W.2d 557 (S.D. 1979). Also, the trial court has a duty to instruct the jury on the law applicable to all issues properly raised at trial, but only on those issues which find support by competent evidence in the record. *Black v. Gardner, supra; Moor v. Iowa Manufacturing Co.,* 320 N.W.2d 927 (S.D.1982); *Wolf v. Graber,* 303 N.W.2d 364 (S.D.1981). Finally,

> an appellant who seeks to set aside a civil verdict because of an incomplete or ambiguous instruction must establish that it was prejudicial, ... i.e., that under the evidence, the jury might have, and probably would have, returned a different verdict if a correct instruction had been given.

*Schmidt v. Wildcat Cave, Inc.,* 261 N.W.2d 114, 119 (S.D.1977) (citation omitted). *See also Ryken v. Blumer,* 307 N.W.2d 865 (S.D.1981). Mere assertions of what the jury may have concluded are insufficient to satisfy the burden of establishing that an instruction was prejudicial. *Duncan v.*

*Pennington County Housing Authority,* 283 N.W.2d 546, 553 (S.D.1979).

Although plaintiffs' reliance on *Cunningham* is not misplaced, we cannot say that Instruction 16 incorrectly or inadequately explained the duty of a physician to disclose significant risks to his patient. As indicated above, Instruction 16 defined "material information" as

> information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended procedure.

 This language does not differ substantially from plaintiffs' proposed instruction. Accordingly, we conclude that the trial court did not err in giving Instruction 16 and in refusing plaintiffs' proposed instruction.

Plaintiffs' second objection to Instruction 16 is that it failed to inform the jury that a doctor has a duty to make a reasonable disclosure to his patient of any alternative treatment or procedure if such is reasonably appropriate. Again, plaintiffs rely on *Cunningham v. Yankton Clinic, P.A., supra,* as supportive of their position on this issue.

 Plaintiffs claim that the alternative treatment or procedure to the amniocentesis was simply to forego the amniocentesis. Clearly, the patient has the right to elect not to undergo a recommended treatment or procedure. This election is an alternative to treatment, but it is not an alternative treatment or procedure. Expert witnesses for both plaintiffs and defendants agreed that there presently is no alternative diagnostic tool available in lieu of the amniocentesis procedure to obtain the type of information Dr. Madison reasonably sought to obtain. Thus the options available to Mrs. Wheeldon were either to submit to an amniocentesis or not to submit to an amniocentesis. These two options were sufficiently addressed in that portion of Instruction 16 that read:

> [I]t is the duty of a physician or surgeon to disclose material information ... which the physician knows or should

know would be regarded as significant by a reasonable person in the patient's position when deciding to *accept or reject* a recommended medical procedure. (emphasis added)

We reach this conclusion not unmindful of Wheeldons' contention on appeal that Dr. Madison should have discussed with Mrs. Wheeldon alternative methods of treatment after blood was obtained during the September 8, 1982, amniocentesis procedure. This claim, however, was not pursued by the Wheeldons at trial. It is clear from the record that Wheeldons' action against Dr. Madison was premised on three distinct theories: (1) that Dr. Madison carelessly and negligently failed to inform Mrs. Wheeldon of the possible risks of injury incident to the amniocentesis procedure; (2) that Dr. Madison was negligent in performing the amniocentesis procedure; and (3) that Dr. Madison negligently failed to render proper post-operative care to Mrs. Wheeldon.

■ This court has held that the theory on which a case is tried below must be adhered to on appeal. *State Highway Comm'n v. Sweetman Const. Co.*, 83 S.D. 27, 31, 153 N.W.2d 682, 684 (1967); *Berry v. Benner*, 81 S.D. 610, 617, 139 N.W.2d 285, 289 (1966). Inasmuch as Wheeldons neither pleaded nor tried their informed consent claim so as to encompass Mrs. Wheeldon's post-amniocentesis care, we will not entertain such claim for the first time on appeal.

Accordingly, we are satisfied that the trial court's instruction to the jury on this question encompassed the relevant issues pertaining to plaintiffs' informed consent claim.

■ Had the evidence disclosed that an alternative procedure existed, then plaintiffs would, of course, have been entitled to the instruction they requested.

### Informed Consent—Standard of Care

Defendants assert that plaintiffs' informed consent claim should not have been submitted to the jury inasmuch as plaintiffs failed to introduce any expert testimony regarding the risks that Dr. Madison was under a duty to disclose.

In *Block v. McVay*, 80 S.D. 469, 126 N.W.2d 808 (1964), defendant-physician discovered a hard lump under plaintiff's skin. Defendant believed that the lump was a potentially cancerous tumor in a lymph node that could indicate the spreading of cancer in the plaintiff's body. Defendant advised plaintiff that the surgical procedure involved in removing such a lymph node was a routine one. He did not discuss with her any potentially hazardous consequences associated with the operation because, as the evidence established, there usually were none. During the operation, defendant determined that the lump was not a cancerous tumor of a lymph node, but a neurofibroma, i.e., a benign nerve tumor. Defendant removed the neurofibroma, but in doing so severed some minute nerve fibers causing a continuing neurological defect in plaintiff's right arm. Plaintiff brought a malpractice action, contending that defendant had negligently failed to advise her of the possibility of nerve damage of the type she ultimately sustained. In affirming the trial court's entry of a directed verdict for defendant, this court held, inter alia:

> There is no evidence in this case to show that there were any substantial risks or hazards inherent in an operation for removal of a lymph node tumor in this area. Again, the unfortunate result of the operation does not supply this lack nor do we feel that such matters are within the common knowledge of laymen.

80 S.D. at 477, 126 N.W.2d at 812.

In *Cunningham v. Yankton Clinic, P.A., supra,* we indicated that *Block* did not expressly resolve the question whether expert testimony is required before an informed consent claim may be submitted to the jury. In concluding that it was unnecessary to address the question directly, we stated:

> [W]e need not decide whether an informed consent case may be proven without expert testimony since [the doctor]

admitted on adverse examination that the standards of the medical practice in his community would require him to advise her of the ramifications of the removal of the pin.

Id. at 512 (footnote omitted).

■ A majority of jurisdictions that recognize a cause of action for negligent disclosure adhere to the so called "professional rule," which places the burden on the plaintiff to prove by a preponderance of the expert medical testimony that the reasonable medical practitioner would have made disclosure under the circumstances. *See, e.g., Tant v. Women's Clinic,* 382 So.2d 1120 (Ala.1980); *Fuller v. Starnes,* 268 Ark. 476, 597 S.W.2d 88 (1980); *Woolley v. Henderson,* 418 A.2d 1123 (Me.1980); *Llera v. Wisner,* 171 Mont. 254, 557 P.2d 805 (1976); *Winkjer v. Herr,* 277 N.W.2d 579 (N.D.1979); *Roark v. Allen,* 633 S.W.2d 804 (Tex.1982). *See also* 52 A.L. R.3d 1084 (1973). Consequently, the dimensions of the disclosure duty are delineated through the medium of expert medical testimony. Under this view, a physician can be found to have breached his duty to disclose only upon a showing that his conduct fell below the standard deemed acceptable by his peers in the medical profession.

■ Alternatively, an increasing number of courts have rejected the majority rule, opting instead in favor of a patient-oriented standard. *See, e.g., Canterbury v. Spence,* 464 F.2d 772, *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (D.C.Cir.1972); *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972); *Logan v. Greenwich Hosp. Ass'n,* 191 Conn. 282, 465 A.2d 294 (1983); *Crain v. Allison,* 443 A.2d 558 (D.C.App.1982); *Harnish v. Children's Hospital Medical Center,* 387 Mass. 152, 439 N.E.2d 240 (1982); *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972); *Cross v. Trapp,* 294 S.E.2d 446 (W.Va.1982); *Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis.2d 1, 227 N.W.2d 647 (1975). *See also* 88 A.L.R.3d 1008 (1978). In place of the reasonable medical practitioner standard, this approach utilizes an objective, reasonable person standard. Under this approach, the trier of fact could find that a physician acted unreasonably under the circumstances in failing to disclose material information to his patient despite unrebutted expert medical testimony that the physician's conduct was reasonable.

The seminal decision championing rejection of the professional rule is *Canterbury v. Spence, supra.* In *Canterbury,* plaintiff alleged that the defendant physician had failed to inform him of the risk of paralysis inherent in a laminectomy procedure. The trial court granted a directed verdict for the defendant, noting there was insufficient evidence to support plaintiff's claim. The Court of Appeals for the District of Columbia reversed, stating:

We agree that the physician's noncompliance with a professional custom to reveal, like any other departure from prevailing medical practice, may give rise to liability to the patient. We do not agree that the patient's cause of action is dependent upon the existence and nonperformance of a relevant professional tradition. . . .

Nor can we ignore the fact that to bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician alone. Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves.

464 F.2d at 783–84 (footnotes omitted).

■ We agree that the right to know— to be informed—is a fundamental right personal to the patient and should not be subject to restriction by medical practices that may be at odds with the patient's informational needs. Accordingly, we adopt the *Canterbury v. Spence* rule that the standard measuring the performance of the physician's duty to disclose is conduct which is reasonable under the circumstances. *Id.* at 785.

 Consistent with our decision in *Cunningham v. Yankton Clinic, P.A., supra,* we deem a reasonable disclosure to be one which apprises the patient of all known material or significant risks inherent in a prescribed medical procedure, as well as the availability of any reasonable alternative treatment or procedures. 262 N.W.2d at 511. Additionally, material risks incident to abstention from treatment should also be disclosed. A risk is generally defined as material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or risks in deciding whether to submit to the proposed medical treatment or procedure. *See Canterbury,* 464 F.2d at 787; *Wilkinson v. Vesey,* 110 R.I. at 627, 295 A.2d at 689; *Harnish v. Children's Hospital Medical Center,* 387 Mass. at 155, 439 N.E.2d at 243. Materiality, therefore, is the cornerstone upon which the physician's duty to disclose is based.

Our decision today should not be construed as obviating the need for expert medical testimony in all informed consent cases. The risks associated with a particular method of treatment, the frequency or probability of their occurrence, alternatives to treatment, risks accompanying such alternatives, and the consequences of remaining untreated are examples of where expert medical evidence would generally be necessary to edify a lay jury. *See, e.g., Canterbury v. Spence,* 464 F.2d at 791–92; *Wilkinson v. Vesey,* 110 R.I. at 624–625, 295 A.2d at 688; *Sard v. Hardy,* 281 Md. 432, 447–448, 379 A.2d 1014, 1024 (1977); *Harnish v. Children's Hospital Medical Center,* 387 Mass. at 152, 439 N.E.2d at 243; *Cornfeldt v. Tongen,* 262 N.W.2d 684, 702 (Minn.1977); *Miller v. Kennedy,* 11 Wash.App. 272, 283–284, 522 P.2d 852, 861 (1974), *aff'd* 85 Wash.2d 151, 530 P.2d 334 (1975). As stated by the Supreme Court of Appeals of West Virginia in *Cross v. Trapp, supra:*

> [A]lthough expert medical testimony is not required under the patient need standard to establish the scope of a physician's duty to disclose medical informa-

tion to his or her patient, expert medical testimony would ordinarily be required to establish certain matters including: (1) the risks involved concerning a particular method of treatment, (2) alternative methods of treatment, (3) the risks relating to such alternative methods of treatment and (4) the results likely to occur if the patient remains untreated.

294 S.E.2d at 455.

 Inasmuch as there is no duty to disclose unless the physician knew or should have known of the risk to be disclosed, *Cornfeldt v. Tongen,* 262 N.W.2d 684, 699, expert testimony will ordinarily be necessary to establish this predicate to liability for nondisclosure. "What the physician should know involves professional expertise and can ordinarily be proved only through the testimony of experts." *Harnish v. Children's Hospital Medical Center,* 387 Mass. at 156, 439 N.E.2d at 243. *See also Reinhardt v. Colton,* 337 N.W.2d 88 (Minn.1983).

 Also, our holding does not mandate that a physician chart in exacting detail for the patient each proposed medical procedure. A physician need not discuss extremely remote risks; risks already known to the patient or "those of which persons of average sophistication are aware." *Canterbury,* 464 F.2d at 788. Furthermore, a physician must also be permitted to exercise some discretion where full disclosure would be detrimental to the patient's well being, as "patients occasionally become so ill or emotionally distraught on disclosure as to foreclose a rational decision, or complicate or hinder the treatment, or perhaps even pose psychological damage to the patient." *Id.* at 789 (footnote omitted). In these exceptional situations, a physician retains a qualified privilege to withhold information from the patient. *Id.; see e.g., Scaria,* 68 Wis.2d at 11–12, 227 N.W.2d at 653. Also, as we stated in *Cunningham, supra,* a physician is not required to obtain the patient's consent in an emergency situation where the patient is in immediate danger. 262 N.W.2d at 511.

Finally, we take note of what is axiomatic to the law of negligence. Establishing a breach of the physician's duty to disclose is only a predicate to the imposition of liability. Plaintiff must also demonstrate that the undisclosed risk manifested itself, causing the complained-of injury, and, secondly, that had the risk been disclosed plaintiff would have refused treatment. Whether plaintiff would have refused treatment is resolved by applying a reasonably prudent person standard. The applicable test is whether a reasonable person in the patient's position would not have agreed to the proposed treatment if adequately apprised beforehand of the material risk which resulted in injury. *See, e.g., Canterbury,* 464 F.2d at 791; *Cornfeldt v. Tongen,* 262 N.W.2d at 701; *Scaria,* 68 Wis.2d at 13–14, 227 N.W.2d at 654; *Wilkinson,* 110 R.I. at 627, 295 A.2d at 689.

### *Violation of Physician-Patient Privilege*

Plaintiffs contend that the trial court erred by admitting testimony from Dr. Russel Orr, who was treating Mrs. Wheeldon at the time of trial. We conclude that the trial court properly denied plaintiffs' motion to bar Dr. Orr's testimony.

Mrs. Wheeldon first contacted Dr. Orr, a board-certified obstetrician and gynecologist, after the September 8 stillborn delivery. Mrs. Wheeldon remained in Dr. Orr's care at the time defendants called him to testify as an expert witness at trial. On direct examination by defendants, Dr. Orr was asked to render an opinion on the standard of care exercised by Dr. Madison respecting his treatment of Mrs. Wheeldon. Dr. Orr's opinion was restricted solely to the medical and hospital records previously received into evidence. The fact that Mrs. Wheeldon was then under Dr. Orr's care was not revealed during defendants' direct examination. Nor was Dr. Orr asked by the defendants to testify to any matters confided to him by Mrs. Wheeldon or to any information obtained by him from her during the course of treatment.

The physician-patient privilege has no common law basis. 2 *Weinstein's Evi-*dence § 504[01] at 504–8. The privilege is created and controlled by statute or court rule. In South Dakota, the physician-patient privilege is set forth in SDCL 19–13–7, one of our court-adopted rules of evidence. SDCL 19–13–7 provides:

A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

SDCL 19–13–6(4) defines "confidential" as:

A communication is "confidential" if not intended to be disclosed to third persons, except persons present to further the interest of patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

The intent of this rule is clear. Only "confidential communications" between a physician and his patient are protected under the statute. As noted above, defendants on direct examination did not attempt to elicit any information from Dr. Orr that was related to his treatment of Mrs. Wheeldon.

Plaintiffs argue that our decision in *Hogue v. Massa,* 80 S.D. 319, 123 N.W.2d 131 (1963), compels a different result. We disagree.

In *Hogue* the defendant-physicians sought to depose the physician who had taken over plaintiff's care from defendants. Defendants' objective was to obtain information concerning the subsequent treating physician's care of plaintiff. We held that this information was protected under the

physician-patient privilege as then defined by SDC 1960 Supp. 36.0101(3):

A physician or surgeon, or other regular practitioner of the art, cannot, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.

SDC 1960 Supp. 36.0101(3), as amended in 1979, is now found at SDCL 19-2-3, which reads:

In any action or proceeding or quasi-judicial administrative proceedings, whenever the physical or mental health of any person is in issue, any privilege under § 19-13-7 shall conclusively be deemed to be waived at trial or for the purpose of discovery under chapter 15-6 if such action or proceeding is civil in nature; and such privilege shall also conclusively be deemed to be waived at trial or for any purpose provided by chapter 23A-12 or 23A-13 if such action or proceeding is criminal in nature.

■■ As can readily be seen, SDCL 19-2-3 is more restrictive than its predecessor. Additionally, *Hogue* is distinguishable from the instant case inasmuch as the defendants in *Hogue* sought information from plaintiff's physician pertaining to his treatment of the plaintiff. Here, Dr. Orr's opinion was restricted to an interpretation of the medical and hospital records already in evidence and did not embrace information concerning his care and treatment of Mrs. Wheeldon. Therefore, the physician-patient privilege created by SDCL 19-13-7 was inapplicable.

*Withholding Exhibit From Jury*

The remaining issue from appeal # 14444 is plaintiffs' contention that the trial court erred by not allowing an exhibit consisting of an anatomical model of a full-term fetus, placenta, and umbilical cord to be taken into the jury room during deliberations.

Prior to commencement of trial, plaintiffs' counsel moved the court for permission to use the anatomical model during opening statement. The trial court granted the motion, receiving the model for illustrative purposes. The only other occasion the model was utilized by plaintiffs' counsel was during his adverse examination of Dr. Madison, when he briefly asked Dr. Madison to identify various blood vessels located on the placenta.

Based upon the limited purpose for which the exhibit was received and utilized and the potential for misuse of the exhibit, the trial court granted defendants' motion that the exhibit not be sent to the jury room.

SDCL 15-14-20 provides that

[u]pon retiring for deliberation the jury may take with them all papers which have been received as evidence in the cause, except depositions and such papers and exhibits as ought not, in the opinion of the court, to be taken from the person having them in his possession; and they may also take with them notes of the testimony or other proceedings on the trial taken by themselves, or any of them, but none taken by any other person.

In construing a statute similar to SDCL 15-14-20, the Minnesota Supreme Court observed that "[u]nder this [statute] the trial court, at the suggestion of or on motion of counsel or in its own discretion, may for good cause withhold or restrict by proper instructions the use of exhibits by the jury. Thus the trial court has a wide discretion in the use of exhibits by the jury." *Jensen v. Dikel*, 244 Minn. 71, 79, 69 N.W.2d 108, 114 (1955) (citations omitted). *See also Pakul v. Montgomery Ward Co.*, 282 Minn. 360, 166 N.W.2d 65 (1969); *Adrian v. Edstrom*, 304 Minn. 52, 229 N.W.2d 161 (1975); *Larson v. Midland Cooperatives, Inc.*, 305 Minn. 256, 232 N.W.2d 810 (1975).

■■ We agree with the Minnesota Supreme Court's analysis of the Minnesota statute, and we hold that the trial court has wide discretion under SDCL 15-14-20 in overseeing the use of exhibits by the jury. There remains the question whether that discretion was abused.

■ As noted above, the exhibit in question was used by plaintiffs' counsel for illustrative purposes during opening argument and only briefly during his examination of Dr. Madison. Plaintiffs did not allege that Dr. Madison negligently administered the amniocentesis procedure, only that he negligently managed the bloody tap caused by the amniocentesis procedure. Consequently, there was no issue of fact to be resolved by the jury which centered on the fetus itself. Furthermore, the jury made no request that the exhibit be made available to them. In light of these considerations, we conclude that the trial court did not abuse its discretion in withholding the exhibit from the jury.

#### # 14387, Wrongful Death Count

■ Our affirmance of the jury's verdict in favor of defendants in # 14444 renders plaintiffs' appeal in # 14387 moot. This is so because plaintiffs' wrongful death claim is based upon the same allegations of negligence tried below and resolved in defendant's favor. Accordingly, plaintiffs are barred from pursuing the wrongful death claim by the doctrine of collateral estoppel, which precludes "relitigation of an essential fact or issue involved in the earlier suit." *Cook v. Rezek*, 296 N.W.2d 731, 733 (S.D.1980) (quoting from *Melbourn v. Benham*, 292 N.W.2d 335, 337 (S.D.1980).

We need not decide whether the wrongful death claim is also barred by the doctrine of res judicata. *See, e.g., Arcon Const. Co. v. S.D. Dep't of Transportation*, 365 N.W.2d 866 (S.D.1985); *Black Hills Jewelry Mfg. v. Felco Jewel Ind.*, 336 N.W.2d 153 (S.D.1983); *Gottschalk v. S.D. State Real Estate Comm'n*, 264 N.W.2d 905 (S.D.1978).

■ Only under exceptional circumstances that implicate the public interest will this court retain and decide a moot question on appeal. As we declared in *Stanley County School v. Stanley County Ed. Ass'n:*

> The decision as to whether to retain a moot case in order to pass on a question

of public interest lies in the discretion of the court and generally a court will determine a moot question of public importance if it feels that the value of its determination as a precedent is sufficient to overcome the rule against considering moot questions.

310 N.W.2d 162, 163 (S.D.1981); *Matter of Silver King Mines, Permit EX–5,* 315 N.W.2d 689, 690 (S.D.1982). To invoke the public interest exceptions, three criteria must be met: "(1) general public importance, (2) probable future recurrence, and (3) probable future mootness." *Stanley County, supra,* at 164, quoting from *Anderson v. Kennedy,* 264 N.W.2d 714, 717 (S.D.1978); *Matter of Silver King Mines, Permit EX–5, supra,* at 690; *State ex rel. Johnson v. Mathis Implement, Inc.,* 325 N.W.2d 58, 59 (S.D.1982); *see also Rapid City Journal v. Circuit Court, etc.,* 283 N.W.2d 563 (S.D.1979).

The issue presented on plaintiffs' appeal from the trial court's dismissal of this wrongful death claim is not of the type which evades review by this court. Thus, the second and third prongs of the public interest test are not satisfied. Consequently, we decline to address the question raised on appeal # 14387 and dismiss that appeal as moot.

The judgment in # 14444 is affirmed. Appeal # 14387 is dismissed.

MORGAN, J., WUEST, Circuit Judge, acting as a Supreme Court Justice, and YOUNG, Circuit Judge, concur.

HENDERSON, J., dissents.

YOUNG, Circuit Judge, sitting for FOSHEIM, C.J., disqualified.

HENDERSON, Justice (dissenting).

This case is a travesty of justice and I write for Heather Wheeldon and the unborn children of this world. And I write for her parents who tragically lost her to a testing procedure called amniocentesis. This case should be reversed and sent back to the trial court for a retrial.

A defense motion for partial summary judgment was granted by the trial court which dismissed the wrongful death count in the complaint, the holding of the trial court being that there is no cause of action for the wrongful death of an unborn "viable" child under South Dakota law. I do not like the word "viable." It is not my word but it is a word that lawyers and courts seem to use. A viable child, apparently, is a child who is capable of living or capable of growing or developing or capable of working and functioning or developing adequately. So far as this writer is concerned, I shall refer to an unborn child as a child and as a person. An unborn child is a person just as much as a lawyer, a judge, or a justice. The problem is: an unborn child cannot address the jury, talk to the judge, or advocate his/her case. Were this so, the unborn's advocacy would be unrivaled in the courts of our land.

Heather Wheeldon was a full-term child. Her expected date of delivery was on or about September 10, 1982, per Dr. Madison's testimony. Heather passed on from this life on September 8, 1982, at the Sioux Valley Hospital in Sioux Falls. An amniocentesis was performed at 11:30 a.m. on that day in Dr. Madison's office and the child made thrashing movements. When the mother later felt no movement of the child within her, and being concerned, she went to the said Sioux Valley Hospital where it was determined that the child had died. According to the testimony, the child was delivered by cesarean section and she was an absolute normal, perfectly formed baby and of full-term size. By medical testimony, to include that of Dr. Madison, it was established that the placenta attached to the child's umbilical cord had been lacerated by the amniocentesis needle and the child had bled to death. Heather would have survived if only she had been delivered after the bloody amniocentesis tap and before she exsanguinated. SDCL 21-5-1 is the wrongful death statute in South Dakota and it provided in pertinent part, at the time of Heather's death:

Whenever the death or injury of a *person* shall be caused by a wrongful act, neglect, or default ... such as would have entitled the party injured to maintain an action and recover damages in respect thereto, ... the person who, would have been liable, if death had not ensued, ... shall be liable, to an action for damages .... (Emphasis supplied.)

Heather Wheeldon was a person within the meaning of the wrongful death statute. The fact of her life, a living life, is not to be denied, nor should the wisdom of the public policy of our forefathers be denied. Heather Wheeldon is, and was, entitled to the protection of the law. The first unalienable right of man is the right to life itself. Since 1887, the law of the State of South Dakota has provided, and is now found at SDCL 26-1-2:

> *Unborn child deemed existing person.* A child conceived, but not born, is to be deemed an existing person so far as may be necessary for its interests in the event of its subsequent birth.

The old timers who got this state underway had more sense than we moderns because they had better values. Early in the days of the Dakota Territory, early in our Statehood, they were concerned with the rights of the unborn. SDCL 30-27-2 provides that a guardian may be appointed for a child born or likely to be born. Therefore, can there be any doubt that our Legislature has recognized the rights of the unborn? Moreover, SDCL 22-17-6 makes it a crime to intentionally kill a human fetus. Then, in 1984, SDCL 21-5-1, the wrongful death statute, was amended by defining the word "person" to include "an unborn child." Therefore, I cannot fathom how this trial judge could have summarily decided that this unborn child, Heather Wheeldon, was not a person within the meaning of the wrongful death statute. Believing that a wrongful death action can be maintained for an unborn child, I ponder if the mother can die and the child-fetus live, or the child-fetus die and the mother live, how can it be intelligently urged that there is but only one life? *See* Annot., *Right to Maintain Action or to Recover Damages for Death of Unborn Child,* 84 A.L.R.3d

411 (1978); Cherken, *Torts—Wrongful Death—Recovery for Wrongful Death of a Stillborn Fetus Examined,* 21 Vill.L.Rev. 994 (1975–76); *Vaillancourt v. Medical Center Hospital of Vermont,* 139 Vt. 138, 425 A.2d 92 (1980).

Article VI, § 20, of the South Dakota Constitution provides:

> All courts shall be open, and every man for an injury done him in his property, person or reputation, shall have remedy by due course of law, and right and justice, administered without denial or delay.

"Clearly and unequivocally, our constitution directs that the courts of this state shall be open to the injured and oppressed. We are unable to view this constitutional mandate as a faint echo to be skirted or ignored." *Daugaard v. Baltic Co-op. Bldg. Supply Ass'n,* 349 N.W.2d 419, 425 (S.D.1984). For the State of Ohio's interpretation of a very similar constitutional provision regarding an unborn child, *see Stidam v. Ashmore,* 109 Ohio App. 431, 167 N.E.2d 106 (1959). There, the Supreme Court of Ohio granted protection of the law to the wrongful death of an unborn child; and further quoted an earlier decision, *Williams v. Marion Rapid Transit, Inc.,* 152 Ohio St. 114, 87 N.E.2d 334 (1949), which approved of a cause of action for a prenatal injury to a child.

The trial court also erred by failing to give the plaintiffs' requested instruction on informed consent. As the majority opinion concedes, plaintiffs' requested instruction is based upon our ruling in *Cunningham v. Yankton Clinic, P.A.,* 262 N.W.2d 508, 511 (S.D.1978), wherein this Court held:

> A doctor has the duty to make a reasonable disclosure to his patient of the significant risks in view of the gravity of the patient's condition, the probabilities of success, *and any alternative treatment or procedures,* if such are reasonably appropriate, so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure. (Emphasis supplied.)

*Cunningham* is the settled law of this state, *see Alberts v. Giebink,* 299 N.W.2d 454, 456 (S.D.1980), and the plaintiffs' requested instruction clearly and succinctly states the applicable law. Note in plaintiffs' requested instruction, that the words "any alternative treatment or procedures" are used just as in *Cunningham* and *Alberts.* The trial court, however, refused the plaintiffs' requested instruction and gave the instruction recited in the majority opinion. Note that in the instruction given by the trial court, that the phrase or words "any alternative treatment or procedures" are not recited. Further note that the words "reasonably appropriate" and "reasonably necessary" are not in the instruction given by the trial court. The trial court's instruction diluted the holdings of *Cunningham* and *Alberts.*

A trial court's refusal to give a requested instruction which sets forth the applicable law constitutes prejudicial error. *See Van Zee v. Sioux Valley Hospital,* 315 N.W.2d 489, 492 (S.D.1982); *Ryken v. Blumer,* 307 N.W.2d 865, 869 (S.D.1981); *Wolf v. Graber,* 303 N.W.2d 364, 366 (S.D.1981); and *Miller v. Baken Park, Inc.,* 84 S.D. 624, 631, 175 N.W.2d 605, 609 (1970), *modified,* 85 S.D. 133, 178 N.W.2d 560 (1970).

Here, the trial court rejected a *clear* instruction on the *settled* and *applicable* law and in its place gave an instruction which the majority opinion has to *interpret* in order to uphold its application. The given instruction, however, fails to clearly outline a physician's duty to inform of alternative procedures. Abstaining from suggested or further treatment or procedures *is* an alternative procedure of which physicians must inform their patients. This is evidenced by Dr. Madison's actions after performing the bloody amniocentesis tap.

After performing the bloody amniocentesis tap, Dr. Madison sent the mother, Mrs. Wheeldon, home. He did not inform her that a fetal heart monitor machine could be utilized. He did not inform her that this could be done in his office or at the hospital. And he did not inform her that an immediate delivery could be per-

formed if the heart monitoring showed the child to be bleeding to death. This is dumbfounding as the Sioux Valley Hospital was just across the street. These were all additional alternative procedures to sending her home. These were alternative recommended procedures, of which Dr. Madison was aware through published medical literature, for the management of a bloody amniocentesis tap. Dr. Madison, however, failed to inform Mrs. Wheeldon of these alternative procedures and *he* (not the uninformed mother) elected to abstain from further medical procedures. Having lacerated the placenta attached to the child's umbilical cord, he virtually did nothing. On September 8, 1982, when Dr. Madison obtained a bloody amniocentesis tap, he testified that he did not have in mind von Willdebrand's Disease in the Wheeldon family history. This is amazing when one considers that the Wheeldons discussed this bleeding disorder with Dr. Madison and that he, Dr. Madison, knew this disease was a clotting disorder transmittable through heredity to both male and female offspring. This doctor knew that this disease would cause serious problems for the mother or an unborn child if not properly managed by a doctor. The failure to take alternative procedures, after the injection of the needle and the thrashing around of the child becomes even more amazing in view of the doctor's statement that he "must have nicked the baby's foot." His failure to take alternative procedures became vividly clear for the testimony discloses that when the cesarean section was underway, blood splattered out on the floor of the hospital, and the doctor, and his assistants, knew that a blood vessel had been punctured by the needle and the child had simply bled to death.

A doctor has the duty to make a reasonable disclosure to his patient of any alternative treatment or procedures. *Cunningham.* This is the settled and applicable law of this state. *Alberts.* After performing a bloody amniocentesis tap, alternative procedures for the protection of the child were available, but Dr. Madison failed to so inform Mrs. Wheeldon. The plaintiffs' re- quested instruction states the applicable law and is supported by the record. If given, the jury, most assuredly, might have, and probably would have, returned a different verdict. Thus, I would hold the trial court's refusal to give plaintiffs' requested instruction constituted prejudicial and reversible error.

Another grievous error which might have, and probably would have, affected the verdict in this case, was the granting by the trial court of Dr. Madison's attorney's motion to not permit the jury to have Exhibit 21 in the jury room. This was a rank ruling of major proportion. Exhibit 21 was a plastic anatomical model of a fetus, umbilical cord, and placenta. This was a helpful tool to the jury in its deliberations. It was marked as an exhibit during the opening statement. Then, during the course of the trial, it was received without qualification and the trial court stated "Exhibit 21 is received." *See* Trial Transcript at page 145. Once received in evidence, without any objection by Dr. Madison's attorneys, and there being testimony on the exhibit, it was an abuse of discretion and a monumental error in trial to keep the jury from having the exhibits available to them in their deliberation. In 35 years, in the trial bar, on the trial bench, and on the appellate court, I have never observed such a preposterous ruling. For this Court to approve of such evidentiary procedure, is incredulous.

Lastly, I wish to state that the time constraints are such, and the workload of this Court so heavy, that the burden restricts me from attacking paragraph after paragraph of obiter dicta in the majority opinion—dicta in the form of a law school treatise which is ungermane to the case at hand. *See* commentary of Henderson, J., on staggering growth of appeals in the South Dakota Supreme Court, in *Interest of A.M.L.,* 371 N.W.2d 358, 360 (S.D.1985) (Henderson, J., concurring specially) at footnote.

I would therefore reverse and remand for a retrial.