**Patricia SAVOLD, Plaintiff
and Appellant,**

v.

**Dr. Dennis L. JOHNSON,
Defendant and Appellee.**

No. 16435.

Supreme Court of South Dakota.

Considered on Briefs May 22, 1989.

Decided July 12, 1989.

Rick Johnson of Johnson, Eklund & Davis, Gregory, for plaintiff and appellant.

Carleton R. Hoy of Hoy & Hoy, Sioux Falls, for defendant and appellee; James L. Hoy of Hoy & Hoy, Sioux Falls, on the brief.

MILLER, Justice.

In this medical malpractice case we hold that expert testimony was not required on the issue of informed consent.

## FACTS

Patricia Savold appeals from an order granting a motion for a directed verdict granted against her and in favor of appellee Dr. Dennis L. Johnson. Savold alleges that the trial court erred in granting Johnson's motion, arguing that expert testimony was not required on the issue of informed consent. We agree.

In February 1985, Savold sought the medical advice of Johnson, an orthopedic surgeon in Sioux Falls, South Dakota, concerning a bunion on her right foot. Johnson diagnosed Savold as having a recurring bunion, an abnormal widening of the forefoot and a claw-toed deformity of the second toe. Johnson advised Savold that she could either undergo a bunionectomy/osteotomy procedure * or she could elect to leave the foot alone. Savold, who had undergone a previous bunionectomy in 1957, elected to have the surgery.

On the night prior to the surgical procedure, Savold signed a consent form authorizing the bunionectomy and second-toe pinning. During the procedure, Johnson placed three internal pins in Savold's foot and two external pins in her first and second toes. Savold was discharged from the hospital several days later. A week after her discharge, Savold went to the hospital emergency room complaining of pain and throbbing in her big toe. Johnson examined Savold's foot and discovered that the pin in her big toe had been knocked out of position. The pin was readjusted and the foot was rewrapped by Johnson.

The external pins in Savold's toes were removed in Johnson's office slightly more than a month after the operation. According to Johnson, Savold was informed that the other three pins in her foot need not be removed. Savold returned to Johnson's office approximately six weeks later complaining of tenderness and swelling in her foot and feeling something sharp in the area where she tied her shoes. X-rays revealed the location of the remaining pins and Johnson prescribed anti-inflamatory medication. *Savold contends that this is the first time that she had ever learned that there were pins still remaining in her foot.*

Three weeks later, Savold returned to Johnson's office concerning the painful sensations she was experiencing. Johnson discerned that one of the pins in her foot had migrated from its original position and that it could be removed. Savold informed Johnson that she wanted *all* of the remaining pins removed from her foot. At trial, Johnson testified that he told Savold that he would remove those pins which could be easily retrieved. Ten days later Johnson removed two of the three remaining pins. Johnson decided to leave the third pin in Savold's foot because it was deep inside the bone and could not be easily retrieved. According to Johnson, Savold was informed after the surgery that one pin remained in her foot but it might need to be removed later if it migrated from its current location or could be palpated. *Savold denies that this conversation occurred.*

In June 1986, ten months after her last consultation with Johnson, Savold was examined by Dr. Phil Gross, another orthopedic surgeon in Sioux Falls. Savold told Gross that she was having trouble with pain in her right hip, knee, and foot. X-rays taken by Dr. Gross revealed that the correction of the bunion was "nice and straight." The x-rays also showed the remaining pin buried one-half inch beneath the bone in her foot. *Savold claims that this is when she first learned that her foot still contained a pin.* For her pain, Gross prescribed that she use her left foot when operating machinery at work and that she lose weight.

About a month later, Savold returned to Gross' office with the same complaints.

---

* The proposed surgical procedure consisted of the removal of the bunion, narrowing of the forefoot by excising some of the bone, straightening the angle between the toes, and correcting the claw toe. Insertion of pins would apparently be required in order to hold the bones in the proper position until they had healed. External protruding pins would be placed in the first and second toes and internal pins would be placed through the bones in the middle part of Savold's foot. The pins in Savold's toes would be removed three to six weeks after surgery and the other pins in her foot, barring any complications, could be left in her foot permanently.

Savold indicated that she wanted the remaining pin removed. Gross explained to her that removing the pin would not be an easy procedure and that its removal might not cure the problem she was having with her leg. (At trial, Gross indicated that he believed Savold had developed a "fixation" about the pin and that he was not anxious to perform the operation.) He told Savold that he would get Johnson's previous x-rays and would meet with her later to discuss whether surgery should be performed.

In August 1986, Savold returned to Gross' office, still indicating that she wanted the pin removed. Several days later, Gross performed the surgical procedure and extracted the pin. Gross observed the presence of granulation tissue in the area adjacent to the pin, which he testified could have been a possible source of irritation. After the surgery, Savold returned to Gross' office on three occasions, still complaining of pain in her right hip, knee and foot. Gross could find no cause for the pain and told her that there was nothing more he could do for her.

In February 1987, Savold commenced a medical malpractice action against Johnson, alleging that he failed to secure her informed consent for the pin implantation performed in February 1985, that he negligently installed the pins during the procedure, negligently removed the pins in June 1985, and failed to inform her that one pin remained in her foot after the others were removed. Johnson answered, asserting that he had complied with the informed consent standards and that his actions were not negligent. Johnson filed a motion for summary judgment. The trial court granted summary judgment on Savold's negligence claims. Savold has not appealed that holding. Savold's informed consent claims went to trial before a jury. Johnson and Gross both testified, but neither gave any expert testimony on the informed consent issue.

It is important to note the procedural posture of this case. At a recess during Savold's case-in-chief, the trial court intended to hear an offer of proof and several other matters which the court had taken under advisement. Counsel for both parties agreed that all of the testimony *on the question of informed consent* had been presented. The court inquired as to whether Savold's counsel wanted to argue on the issue of informed consent at that time or whether he would rather present his entire case. Savold's counsel stated that he had "no problem" with consideration of the informed consent issue at that time. Thus, while *Savold's counsel had not presented evidence on causation or damages* (therefore, arguments regarding causation are premature and speculative at this time), he admitted that all of the evidence which he planned to present on the informed consent issue had been ·placed before the jury. Johnson's counsel then made his motion for directed verdict which the trial court, after hearing argument from both sides, granted. Savold appeals. We reverse.

## DECISION

**WHETHER THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT BECAUSE SAVOLD FAILED TO PRESENT EXPERT TESTIMONY ON THE ISSUE OF INFORMED CONSENT.**

Savold claims that the trial court erred in directing a verdict in favor of Johnson because of her failure to present expert testimony on the issue of Johnson's duty to procure Savold's informed consent concerning the implantation and removal of the internal pins. When faced with a motion for directed verdict, we must accept as true the evidence presented by the nonmoving party and indulge all legitimate inferences in favor of the party against whom the motion is brought. *Kreager v. Blomstrom Oil Company*, 379 N.W.2d 307 (S.D. 1985); *Budahl v. Gordon & David Associates*, 323 N.W.2d 853 (S.D.1982); *Myers v. Quenzer*, 79 S.D. 248, 110 N.W.2d 840 (1961). We must determine if there is any substantial evidence to sustain the cause of action. If such evidence exists as would allow reasonable minds to differ, the case must go to the jury. *Haggar v. Olfert*, 387 N.W.2d 45 (S.D.1986); *Sabag v. Continen-*

*tal South Dakota,* 374 N.W.2d 349 (S.D. 1985); *Lytle v. Morgan,* 270 N.W.2d 359 (S.D.1978).

In *Wheeldon v. Madison,* 374 N.W.2d 367 (S.D.1985), this court adopted a patient-oriented standard to be used in medical malpractice informed consent cases. Under *Wheeldon,* the standard for measuring performance of a physician's duty to disclose a risk is conduct which is reasonable under the circumstances. A reasonable disclosure is "one which apprises [the] patient of all known material or significant risks inherent in a prescribed medical procedure, as well as the availability of any reasonable alternative treatment or procedures." *Wheeldon* at 375. Moreover, "material risks incident to abstention from treatment should also be disclosed. A risk is generally defined as material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or risks in deciding whether to submit to the proposed medical treatment or procedure." *Id.* (citing *Canterbury v. Spence,* 464 F.2d 772, 787 (D.C.Cir. 1972)). While expert medical testimony is not required under this standard in order to establish the scope of a physician's duty to disclose medical information to a patient, such testimony still may be required in order to establish other matters including "(1) the risks involved concerning a particular method of treatment, (2) alternative methods of treatment, (3) the risks relating to such alternative methods of treatment, and (4) the results likely to occur if the patient remains untreated." *Id.* (quoting *Cross v. Trapp,* 294 S.E.2d 446, 455 (W.Va. 1982)).

█ While *Wheeldon* sets forth factors to be considered in determining whether *adequate* information was provided in order for a patient to make an informed decision concerning the efficacy of a medical procedure, we note in this case that there is a factual dispute as to whether *any* information concerning the implantation or removal of the internal pins was given to Savold so that she could give her informed consent. We do not believe that this question of disputed fact requires the introduction of expert testimony since the controversy centers around whether *any* information was given to Savold. Instead, the proper rule which should have been applied is whether a reasonable person in Savold's position "would not have agreed to the proposed treatment if adequately apprised beforehand of the material risk which resulted in [the] injury." *Wheeldon* at 376 (citations omitted). This case presents a question of disputed fact which does not require the introduction of expert opinion. As was urged in appellant's reply brief:

> It is important that the jury be allowed to decide the credibility of Mrs. Savold verses the credibility of Dr. Johnson. If the jury finds that Dr. Johnson did tell Mrs. Savold that he put pins in her foot, and that Dr. Johnson did tell Mrs. Savold that a pin remained in her foot after the second surgery, there will be no verdict for the Plaintiff. If that issue is resolved in favor of the Plaintiff, the jury would still then decide whether causation of her persistent pain and problems is related to the pain remaining [in] her foot.

We therefore hold that the trial court erred in directing a verdict in favor of Johnson based upon Savold's failure to produce expert testimony on the issue of informed consent. *Wheeldon, supra; see also Alberts v. Giebink,* 299 N.W.2d 454 (S.D.1980); *Cunningham v. Yankton Clinic, P.A.,* 262 N.W.2d 508 (S.D.1978); and *Canterbury, supra.*

Reversed.

All the Justices concur.